**Louis FARRAKHAN, Minister and Muhammad Mosque, Inc., Plaintiffs,**

v.

**Ronald Wilson REAGAN, et al., Defendants.**

Civ. A. No. 86–1783.

United States District Court, District of Columbia.

June 3, 1987.

Natilie O. Ludaway, Frederick A. Douglas, Leftwich, Moore & Douglas, Washington, D.C., for Louis Farrakhan, Minister, plaintiff.

Frederick A. Douglas, Washington, D.C., for Muhammad Mosque, Inc., plaintiff.

Don J. Mros, Civ. Div., Washington, D.C., for Ronald Wilson Reagan, George C. Schultz, James A. Baker III and Edwin A. Meese III, defendants.

## MEMORANDUM ORDER

JOHN H. PRATT, District Judge.

The court has before it the government's motion to dismiss all counts of the complaint brought by plaintiffs Louis Farrakhan and Muhammad Mosque, Inc. The government asserts failure to exhaust administrative remedies and failure to state a claim upon which relief can be granted as grounds for its motion. In addition, this court, *sua sponte*, raised the issue of the plaintiffs' standing. All issues have been fully briefed. For the reasons outlined be-

low, we grant the government's motion both as to plaintiff Farrakhan and as to plaintiff Muhammad Mosque, Inc.

## Background

On January 7, 1986, in the wake of terrorist bombings at airports in Rome, Italy and Vienna, Austria, President Reagan declared a national emergency and invoked his powers under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701, *et seq.*, to impose wide-ranging and comprehensive economic sanctions against Libya.[1] The effect of the sanctions is to halt virtually all economic intercourse with Libya, *see* Ex. Ord. 12543, 51 Fed. Reg. 875 (Jan. 7, 1986), and to "block" all Libyan property in the United States, *see* Ex. Ord. 12544, 51 Fed. Reg. 1235 (Jan. 8, 1986). The Treasury Department subsequently issued regulations implementing these executive orders. 50 C.F.R. Part 550 (Libyan Sanction Regulations). In addition, prior to the President's declaration of a national emergency, the State Department had issued a notice of restriction declaring that United States passports are invalid for use in travel to, from and through Libya without special validation. 50 Fed. Reg. 49809 (Dec. 4, 1985). The Libyan Sanction Regulations supplemented this ban by prohibiting all transactions relating to travel to or within Libya. 50 C.F.R. § 550.207.

On February 5, 1986, Minister Farrakhan denounced the sanctions in a press conference at the National Press Club in Washington, D.C. Following the speech, Farrakhan announced his intent to travel to Libya.

Shortly thereafter, Farrakhan left the United States. On February 8, 1986, it was reported in a Chicago newspaper column that Attorney General Meese, when asked about Farrakhan's announced intention to travel to Libya, had stated that if and when Farrakhan went to Libya "he should be prosecuted." Compl. Ex. 2. The same column also reported that Farrakhan was visiting Nigeria and other African nations, but that, according to a Farrakhan spokesman, his itinerary did not include Libya. *Id.*

In fact, Farrakhan did travel to Libya. On or about March 12, 1986, he arrived in Libya aboard an Aeroflot flight. Compl. ¶ 24. Farrakhan asserts that he did not use his United States passport to enter Libya. *Id.* at ¶ 25. While in Libya, he attended the Second Mathaba Conference in Tripoli, delivering an address to that body on March 16, 1986. Farrakhan left Libya on March 29, 1986 aboard a Saudi Airlines flight for Saudi Arabia. *Id.* at ¶ 27. Farrakhan asserts that he did not use his United States passport to leave Libya. *Id.* Subsequently, he returned to the United States.

Plaintiff Farrakhan now asserts that he faces a genuine threat of prosecution for his travels to Libya. *Id.* at ¶ 28. He bases this claim of a threat of prosecution on Meese's alleged statements, as reported in the Chicago newspaper. Farrakhan asserts that his travel to Libya in the wake of the President's declaration of a national emergency is symbolic speech critical of the President's conduct of foreign policy toward Libya. *Id.* at ¶ 31. He contends that the threat of prosecution "chills" his

---

**1.** Under the National Emergencies Act, 50 U.S.C. §§ 1601, *et seq.*, the President is authorized to declare a national emergency by proclaiming that a national emergency exists and publishing this proclamation in the Federal Register. 50 U.S.C. § 1621. The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, *et seq.*, empowers the President during a declared national emergency, *inter alia,* to

    (A) investigate, regulate or prohibit—
       (i) any transactions in foreign exchange,
       (ii) transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or national thereof,

    (iii) the importing or exporting of currency or securities; and
    (B) investigate, regulate, direct and compel, nullify, void, prevent or prohibit any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest;
by any person, or with respect to any property, subject to the jurisdiction of the United States.
50 U.S.C. § 1702(a)(1).

First Amendment freedom of speech.[2] He also asserts that the threat of prosecution is intended to discourage him from using Libya as a forum from which to criticize the United States' foreign policy. *Id.* at ¶ 29. He contends that this attempt to limit his choice of forum violates his rights under the First Amendment.

Separate and independent from Farrakhan's claims relating to his March, 1986 trip to Libya are the Muhammad Mosque's claims under the Free Exercise clause. In early April, 1985, the Muhammad Mosque, Inc. received a $5 million loan from the Islamic Call Society, an agency of the Libyan government. Notwithstanding Islamic Call Society's official status, Muhammad Mosque alleges that its only dealings with the Society have been religious in nature. When the Libyan Sanction Regulations were issued in January, 1986, Muhammad Mosque alleges that it was precluded from repaying the loan directly to Islamic Call Society. Because the beliefs of Muhammad Mosque's members require it to repay all loans in a timely manner and preclude the payment of interest, Muhammad Mosque alleges that the Libyan Sanction Regulations impermissibly interfere with the free exercise of religion of its members. In addition, Muhammad Mosque also alleges that the Free Exercise Clause mandates that the Mosque be allowed to extend monetary aid to its religious brethren in the Islamic Call Society for the continued propagation of the Islamic Faith. Compl. at ¶ 36.

*Discussion*

I. *Farrakhan's Lack of Standing*

Consistent with the "case or controversy" requirement of Article III of the Constitution, we must determine whether either plaintiff has raised justiciable claims before proceeding to the merits. Upon review of the claims, the only serious justiciability question presented is plaintiff Farrakhan's standing to bring his claims at this time.[3] We conclude that plaintiff Farrakhan lacks standing to seek adjudication of his claims.

In order to have standing, plaintiff Farrakhan must show three things: (1) the injury is not too abstract, or otherwise inappropriate, to be judicially cognizable; (2) the line of causation between the government's allegedly illegal conduct and injury is not too attenuated; (3) the prospect of obtaining relief from the injury is not too speculative. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324–25, 82 L.Ed.2d 556 (1984). With respect to Farrakhan's claims, absent considerations of a declared national emergency, there is little doubt that if he suffered cognizable injury as a result of the Libyan Sanction Regulations or the threat of prosecution thereunder, such injury would be fully redressable by declaratory judgment or injunction.

In order for Farrakhan to establish that he has suffered a judicially cognizable injury, he must show that he faces the "imminence of concrete, harmful action such as threatened arrest for specifically contemplated First Amendment activity." *United Presbyterian Church in the U.S.A. v. Reagan,* 738 F.2d 1375, 1380 (D.C. Cir.1984). Moreover, Farrakhan must show that the threat of arrest or prosecution is "genuine," not speculative or chimerical. *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223–24, 39 L.Ed.2d 505 (1974). The subjective "chill" of First Amendment freedoms is not sufficient injury on which to

---

**2.** For clarity it must be noted that Farrakhan is alleging a "chilling effect" stemming from the alleged threat of prosecution for his March, 1986 trip to Libya. He is not alleging a genuine threat of prosecution for any future trips to Libya, nor does he base his claims of "chilling effect" upon any threat of prosecution under the sanction regulations for future trips to Libya.

**3.** The government concedes that Muhammad Mosque has standing to litigate its claims. We agree. The Libyan Sanction Regulations are drafted in a manner that effectively precludes the transfer of money from the United States to Libya by conventional means. Moreover, it prohibits any transaction designed to circumvent the restrictions, as well as all "indirect" forms of payment such as satisfaction of Libyan debts to creditors in this country. Since the Libyan Sanction Regulations have the effect of making it impossible or nearly impossible for Muhammad Mosque to repay its loan to Islamic Call Society, Muhammad Mosque has standing.

ground standing. *United Presbyterian Church,* 738 F.2d at 1380.

■ Farrakhan has not shown that the threat of prosecution is "genuine." In support of standing, Farrakhan cites Attorney General Meese's February 1986 statement that Farrakhan "should be prosecuted" if he goes to Libya. While the statement of the Attorney General may in some instances be entitled to great weight, there is nothing to indicate that this is one of those instances. Plaintiff has not shown that the government has sought criminal enforcement of the travel restrictions generally. Other than the Attorney General's single statement, plaintiff cites no evidence from the year since plaintiff's trip to Libya which would indicate that the government is contemplating prosecution. In addition, the government does not have a strong interest in seeking enforcement of the travel-related restrictions, especially when it is not clear from the facts alleged in the complaint that Farrakhan has violated the letter of the Libyan Sanctions Regulations or the State Department's passport restrictions. Under these circumstances, we cannot find that Farrakhan faces a genuine threat of prosecution for his March, 1986 trip to Libya.[4] His asserted fears of prosecution are speculative at best. Thus, Farrakhan does not have standing to raise his claims at this time.

4. Because Farrakhan is only challenging the constitutionality of a potential prosecution under the sanctions regulations for his March, 1986 trip to Libya, we need not consider whether Farrakhan would have had standing to assert that prosecution under the sanctions regulations for future trips to Libya would violate the First Amendment.

5. The government has asserted that Muhammad Mosque has failed to exhaust its administrative remedies. Muhammad Mosque has not applied for a license to deposit its payments to Islamic Call Society into a "blocked account." However, Muhammad Mosque has alleged that payment into a "blocked account" would not satisfy the dictates of timely repayment. The government does not question the sincerity of Muhammad Mosque's belief. In the face of the Mosque's interpretation of its religious duty, the Mosque need not exhaust its administrative remedy because the administrative remedy pro-

## II. *Muhammad Mosque's Free Exercise Claim*

■ Muhammad Mosque having survived the inquiry into standing, we turn to the merits of its claim for relief under the Free Exercise clause of the First Amendment.[5] It is undisputed that the government can only infringe upon Muhammad Mosque's religious conduct if the regulation in question serves a secular purpose and has an essential effect that is non-sectarian, *Braunfeld v. Brown,* 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563 (1961) (plurality), if the governmental interest served by the regulation is compelling,[6] and if the religious conduct cannot be accommodated without undue interference to the governmental interest. *United States v. Lee,* 455 U.S. 252, 256–260, 102 S.Ct. 1051, 1054–57, 71 L.Ed.2d 127 (1982).

The only real issue before the court is whether Muhammad Mosque's religious conduct can be accommodated without undue interference with the government's compelling interest in national security and the end of Libya's alleged participation in "state-sponsored" terrorism.[7] Plaintiff argues that the incremental detriment to the government's interests stemming from direct repayment of the Islamic Call Society loan and from other direct contributions to Islamic Call Society is so extremely small that the incremental detriment to the government is outweighed by the burden

vided by the Libyan Sanction Regulations is not adequate.

6. The Supreme Court recently reaffirmed the "compelling interest" standard. *Hobbie v. Unemployment Appeals Comm'n of Florida,* — U.S. ——, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987). The court explicitly rejected the "reasonable means of promoting a legitimate public interest" standard suggested by Chief Justice Burger's plurality opinion in *Bowen v. Roy,* 476 U.S. 693, ——, 106 S.Ct. 2147, ——, 90 L.Ed.2d 735 (1986).

7. The Libyan Sanction Regulations are facially neutral and uniform in application. Plaintiff does not dispute that the government's interests in national security and international terrorism are secular purposes and that the essential effect of the Libyan Sanction Regulations is non-sectarian. Plaintiff also does not dispute that these interests rise to the level of "compelling" interests.

on plaintiff's religious beliefs. In response, the government argues that an accommodation to Muhammad Mosque would open the door to similar claims by other litigants, thereby thwarting the attempt to prevent Libya from carrying on economic intercourse.

■ The Supreme Court has made clear that in weighing the relative interests and conducting the inquiry into accommodation, courts must consider not only the potential detriment to the governmental interest flowing from an accommodation to the plaintiff, but also the detriment to the governmental interest that would flow from an accommodation to all individuals or groups with similar claims. *United States v. Lee,* 455 U.S. at 259–60, 102 S.Ct. at 1056–57; *see also Heffron v. International Society for Krishna Consciousness,* 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). As illustrated by the court's analysis in *Lee,* in considering the effect on the government's interest, the reviewing court must consider not only the cumulative impact on the program in question, but also any related systemic impact. *Lee,* 455 U.S. at 259–60, 102 S.Ct. at 1056–57 (in a case in which an Amish man sought an exemption from the requirement of paying Social Security taxes, the court also considered the effect of religious accommodations on the general income taxation system).

■ With respect to an accommodation for contributions to the Islamic Call Society, as distinguished from loan repayments, we conclude that Muhammad Mosque is not entitled to such an accommodation. The desire to make contributions to like-minded organizations cannot meaningfully be restricted to the factual situation before the court. Not only is there a significant possibility that there may be other groups wishing to make contributions to the Libyan government as a matter of conscience, but in any situation in which the President has exercised his power to impose sanctions, it is likely that there will be religious groups that feel obligated to make contributions.[8] An accommodation toward all religious groups exempting them from the limitations of economic sanctions would intolerably limit the President's power to deal with international emergencies. Thus, we conclude that the Free Exercise clause does not compel an accommodation for religiously motivated monetary contributions to groups in sanctioned countries.

■ Even assuming, *arguendo,* the absence of a number of groups with similar, or potentially similar claims, we conclude that the Free Exercise Clause does not mandate that a religious organization be allowed to transmit money to foreign governments during a national emergency. This court cannot reliably evaluate the detriment to the security interests of the United States, regardless of whether the monetary transmissions are voluntary contributions or loan repayments, because we cannot ascertain what will happen to the money once it reaches Libya. Conceivably, the money could be used for purely innocuous purposes, or it could be used, directly or indirectly, to subsidize the types of anti-United States activity that the sanction regulations aim to prevent.

The difficulty is not one that can be clarified through further proof. Even if both Muhammad Mosque and the Islamic Call Society were to represent to this court that the loan repayments or contributions would not flow to purposes inimical to United States security interests, we would have no assurance that, once the money entered Libyan jurisdiction, it would not be seized, appropriated, taxed, or otherwise diverted to other purposes. Notably, this uncertainty does not flow from the good faith of the parties to the loan, but from the sovereign powers of the recipient state.

---

**8.** As an example, there is significant opposition in the United States religious community to the current policy toward Nicaragua. If the United States were to impose sanctions against Nicaragua similar to the sanctions against Libya, under Muhammad Mosque's arguments these groups would be entitled to an exemption for contributions to Nicaraguan organizations. Similarly, if stringent sanctions were ever imposed against South Africa, white-supremacist religious organizations could seek a similar accommodation to allow contributions to their brethren in conscience.

In this situation, where the court is incapable of evaluating or controlling the potential for direct or indirect diversion of money within Libya, the court has little choice but to defer to the judgment of the President that all economic intercourse with Libya should cease. The President has made the judgment that all money flowing to Libya potentially threatens the security of the United States. We cannot provide any assurance that Muhammad Mosque's money will not, in fact, inure to purposes injurious to this country. Under these circumstances, we cannot say that Muhammad Mosque's interest in the free exercise of their religious principles outweighs the legitimate and compelling security interests of the United States. Thus, Muhammad Mosque's claim under the Free Exercise clause must be dismissed.

### III. *Muhammad Mosque's Free Speech Claims*

Assuming, *arguendo*, that contributions to Libyan organizations are a form of symbolic speech, Muhammad Mosque also appears to raise free speech claims. Because the analysis of permissible content neutral regulation of symbolic speech parallels analysis under the Free Exercise clause, these claims only require brief comment.[9] Again, the only issue is whether the Libyan Sanction Regulations are the least restrictive alternative.

Under *Heffron v. International Society for Krishna Consciousness*, 452 U.S. at 640, 101 S.Ct. at 2559, we must reject free speech claims based on Muhammad Mosque's desire to voice its dissent through contributions to Libya for the same reasons we denied an accommodation under the Free Exercise clause. To find that the First Amendment free speech guarantees mandated that Muhammad Mosque be allowed to send money to Libya would be to open the door for any group or individual to send money anywhere as an act of symbolic speech. In the face of the national security interests lying behind the sanction regulations, we conclude that there is no alternative that would allow organizations to speak through contributions while still allowing the government to effectuate its legitimate and compelling interests in national security. Thus, Muhammad Mosque has failed to state a cause of action under the First Amendment's free speech guarantees.

### *Conclusion*

In sum, we hold that plaintiff Farrakhan lacks standing to pursue his claims. In addition, Muhammad Mosque, Inc. has failed to state a claim under the First Amendment upon which relief can be granted. As has been indicated, in this situation we are unwilling to second-guess the judgment of the President in the important area of national security. Accordingly, it is by the court this 3rd day of June, 1987

ORDERED that defendants' motion to dismiss is granted, and it is

ORDERED that as to plaintiff Farrakhan, the complaint is dismissed pursuant to Fed.R.Civ.P. 12(b)(1), and it is

ORDERED that plaintiff Muhammad Mosque's claim seeking a declaration that Muhammad Mosque may make contributions to Libyan organizations is dismissed under Fed.R.Civ.P. 12(b)(6) and it is

FURTHER ORDERED that Muhammad Mosque's claim for a declaration that it may repay its loan to Islamic Call Society notwithstanding the Libyan Sanction Regulations, is also dismissed under Fed.R. Civ.P. 12(b)(6).

---

9. Under *O'Brien v. United States*, 391 U.S. 367, 376–77, 88 S.Ct. 1673, 1678–79, 20 L.Ed.2d 672 (1968), regulations restricting symbolic speech are permissible if the regulation is content neutral, furthers a substantial governmental interest unrelated to the suppression of speech, and if there is no less restrictive alternative.