Michael GARTNER; Ralph Rosenberg; and Partnership Independent Press, Inc., d/b/a The Ames Daily Tribune, Plaintiffs,

v.

### UNITED STATES INFORMATION AGENCY, Defendant.

Civ. No. 88–337–E.

United States District Court, S.D. Iowa, C.D.

Oct. 12, 1989.

David W. Belin and Mark McCormick, Belin, Harris, Helmick, Tesdell, Lamson, McCormick, P.C., Des Moines, Iowa, for plaintiffs.

Christopher D. Hagen, U.S. Atty., and John Beamer, Asst. U.S. Atty., Des Moines, Iowa, and John R. Bolton, Asst. Atty. Gen., and Vincent M. Garvey and Jerome L. Epstein, Asst. U.S. Attys., U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendant.

## ORDER

DONALD E. O'BRIEN, Chief Judge.

This matter is before the court pursuant to defendant's resisted motion to dismiss and plaintiffs' resisted motion for summary judgment. Both motions overlap and the parties did not dispute material facts. Therefore, the court considers that ruling

on these motions shall be dispositive of the case.

Plaintiffs, a journalist, a state legislator, and a newspaper publishing company, have brought this action against the United States Information Agency (hereinafter "USIA") seeking a declaratory judgment that section 501 of the Smith–Mundt Act, 22 U.S.C. §§ 1461 and 1461–1a infringes upon their first amendment rights insofar as it "purport[s] to prohibit" the plaintiffs from "receiving and disseminating within the United States information and materials disseminated abroad by the defendant." (Complaint, p. 3.) Plaintiffs' complaint can thus be divided into two parts—the first alleging a violation of the right to receive information, and the second alleging a violation of a right to disseminate information.[1] After careful review of the pleadings, arguments, and documents involved in this matter, the court concludes that plaintiffs' case must be dismissed. First, the court concludes that plaintiffs do not have a right, under the first amendment, to make copies of documents which the USIA uses to disseminate information abroad. The first amendment proscribes the government from passing laws abridging the right to free speech; the first amendment does not prescribe a duty upon the government to assure easy access to information for members of the press. The court further finds plaintiffs lack standing to contend that section 501 prohibits them from disseminating within the United States information obtained from reviewing USIA documents. Further, the court finds that there is no case or controversy concerning the ability of media representatives to disseminate domestically USIA information. Finally, the court finds, in the alternative, that Congress did not intend section 501 to preclude plaintiffs from disseminating USIA information domestically.

---

1. Plaintiffs assert that this is a false dichotomy. In their view, the two are so intertwined that they cannot be separated. The court believes that they must be separated in order to properly analyze this case under constitutional law. The plaintiffs cannot convert a request for unlimited access to government information into a claim of prior restraints. Prior restraints bar any and all access to the particular information as a method by which to prevent them from speaking. Plaintiffs here have access to the information and they can speak about it in public—they just want more convenient access.

**1186**

## I. BACKGROUND

The USIA, an independent agency of the executive branch, is responsible for conducting international informational, educational, and cultural activities for foreign populations. Its mission, if it chooses to accept it, is to further foreign understanding of American society and policies, and to do so, the agency engages in a variety of communication activities, from academic and cultural exchanges, to radio and television broadcasts. *See, generally,* 22 U.S.C. § 1461-1; 22 C.F.R. § 504.

Section 501 of the United States Information and Educational Exchange Act of 1948 provides, in pertinent part:

The director [of USIA] is authorized ... to provide for the preparation, dissemination and dissemination abroad, of information about the United States, its people, and its policies, through press, publication, radio, motion pictures, and other information media, and through information centers and instructors abroad. Any such information ... shall *not be disseminated within the United States,* its territories, or possessions, but,

on request, shall be available in the English language at the agency, at all reasonable times following its release as information abroad, *for examination only* by representatives of the United States press associations, newspapers, magazines, radio systems, and stations, and by research students and scholars, and, on request, shall be made available *for examination only* to members of Congress.

22 U.S.C. § 1461 [hereinafter cited as "section 501"] (emphasis added). Congress restricted the USIA's activities to the foreign sphere in order to prevent the agency from propagandizing the American public.[2] Congress intended that the USIA inform the world about the United States without creating a propaganda agency that could be used by the party in power to indoctrinate the American public.[3] At the same time, Congress intended, since the inception of section 501 in 1948, to provide for oversight of USIA activities. Toward this goal, Congress provided for the press, among others, to have access to USIA information.[4]

\* \* \* \* \* \*

The American taxpayer certainly does not need or want his tax dollars used to support U.S. Government propaganda directed at him or her. Our amendment insures that this will not occur.

131 Cong. Rec. 14945 (June 7, 1985). Thus, section 1461-1a "restate[s] the existing prohibitions on domestic dissemination of USIA products." *Id.*

---

2. In 1965, for example, Congress decided that a joint resolution would be necessary to permit the domestic release of a film on President Kennedy. The Senate Foreign Relations Committee stated that section 501:

limit[s] USIA's activities to disseminating information about the United States *abroad.* It was clearly the intent of Congress when the Act was passed, an intent that has been reaffirmed frequently since, that USIA should not disseminate information domestically.

S.Rep. No. 647, 89th Cong., 1st Sess. 2 (1965) (emphasis original).

In 1985, Congress added another statement of its intent by inserting an amended subsection—also challenged by plaintiffs—entitled "Ban on domestic activities by United States Information Agency":

Except as provided in [section 501] in this section, no funds authorized to be appropriated to the United States Information Agency shall be used to influence public opinion in the United States, and no program material prepared by the United States Information Agency shall be distributed within the United States....

22 U.S.C. § 1461-1a. In introducing this amendment, Senator Zorinsky stated:

By law, the USIA cannot engage in domestic propaganda. This distinguishes us, as a free society, from the Soviet Union where domestic propaganda is a principal government activity.

3. *See supra* note 2; *see also* U.S. Informational Media Guarantee Prog., Hearings before the Comm. on Foreign Relations, United States Senate, 90th Cong., 1st Sess., S. 1030 (Mar. 21 and Apr. 25, 1967), at 94–96. The 1967 hearings stemmed from a recommendation by an advisory commission that section 501 be amended to allow the USIA to disseminate its materials to domestic requestors. *Id.* at 90, 95, 102, and 107. Congress did not adopt this recommendation.

4. Section 501 of the original legislation authorized the agency to "provide for the preparation, and dissemination abroad, of information about the United States, its people, and its policies, through press, publications, radio, motion pictures, and other information media...." It further provided that

[a]ny such press release or radio script, on request, shall be available in the English language at the Department of State, at all rea-

Plaintiffs contend that section 501 is an unconstitutional "prior restraint" of their right to speak. They claim: (1) that they have a constitutional right to make copies of USIA materials that they examine in USIA offices; (2) that Congress unconstitutionally intended to bar *the American public,* including the plaintiffs from disseminating of USIA materials and information within the United States; and (3) that the court must reject the USIA's construction of its statutory mandate, by which the agency does *not* purport to regulate public speech, because Congress did unconstitutionally intend to bar speech by the public.

Defendant USIA contends: (1) that the plaintiffs have no first amendment right to make verbatim copies of USIA documents on USIA premises; (2) that the court should read section 501 so as not to restrict the plaintiffs' right to speak; and (3) that no present case or controversy exists concerning plaintiffs' ability to speak (i.e., to disseminate USIA materials and information) because the defendants have not prevented plaintiffs from doing so and there is no imminent danger that they will be prevented from doing so.

## II. ANALYSIS

The question before the court is whether the congressional balance between preventing domestic dissemination by USIA, on the one hand, and allowing the press and other members of the public to "examine" USIA materials in order to criticize them, on the other, violates any first amendment rights

of the plaintiffs. The court shall first analyze whether plaintiffs have a right under the first amendment to make verbatim copies of USIA documents.[5] The court will then analyze whether the statute has prohibited them from disseminating within the United States information gleaned from the USIA documents without verbatim copying.

### A. Verbatim Copies of USIA Materials.

■ The first amendment to the United States Constitution reads, in pertinent part:

Congress shall make no law ... abridging the freedom of speech, or of the press,....

U.S. Const. amend. I. Freedom of speech forms the vanguard of our democratic freedoms. Justice Hugo Black opined that:

[W]hen our founding fathers, with their wisdom and patriotism, wrote the [first] amendment ... they knew what history was behind them and they wanted to ordain in this country that Congress, .elected by the people, should not tell people ... what they should believe or say or publish, and that is about it. It says "no law," and that is what ... it means.[6]

Nevertheless, no constitutional right is absolute and the right to free speech is not excluded from this rule of necessity. Further, the first amendment reads in the negative, "Congress shall make no law ...,"

sonable times following its release as information abroad, for examination by representatives of the United States press associations, newspapers, magazines, radio systems, and stations, and, on request shall be made available to members of Congress.

22 U.S.C. § 1461 (1964). *See also* S.Rep. No. 647, 89th Cong., 1st Sess. 2 (1965) (provision making USIA materials available for inspection "was included in the law in order to assure that the output of USIA would be subject at all times to scrutiny by responsible persons outside the agency.").

5. Because the plaintiffs have not alleged in their complaint that USIA's refusal to allow them to make verbatim copies of USIA materials at the agency's office is arbitrary, capricious, or inconsistent with congressional intent, that question is not before the court. The sole question is

whether the first amendment guarantees the plaintiffs a right to make verbatim copies of USIA documents at the USIA offices. Because the plaintiffs suggested at argument that a restriction on verbatim copying violates section 501, however, the court notes that the plain meaning of the phrase "examination only" does not encompass verbatim copying, and that Congress did not intend to allow the agency to furnish the public with verbatim copies of USIA materials. *See supra* note 3 (recommendation that agency be permitted to release materials to domestic requestors not adopted by Congress; *infra* Part II(B)(4).

6. Kahn, Edmond, *Justice Black and First Amendment "Absolutes": A Public Interview,* 37 N.Y.U.L. Rev. 549, 554 (1962).

not in the affirmative.[7] The amendment constrains our government from acting in ways which infringe upon our right to free speech; it does not create an affirmative duty upon the government to act.

The starting point for determining whether the plaintiffs have a first amendment right to make copies of government documents on government premises is *Houchins v. KQED, Inc.*, 438 U.S. 1, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978), in which the Supreme Court held that there is no first amendment right to government information.[8] In *Houchins*, the Supreme Court rejected the broadcaster's argument that it had a first amendment right to access to a county jail in order to inform the public of important public issues: "This Court has never intimated a first amendment guarantee of a right to access to all sources of information within government control." *Id.* at 9, 98 S.Ct. at 2593. The *Houchins* Court rejected the same argument plaintiffs present in this case—that a restriction on access to government information is unconstitutional because it indirectly affects speech—holding simply that there is no right of access to information "as distinguished from a right to public information which has been obtained." *Id.* at 10, 98 S.Ct. at 2594.

■ When a member of the public seeks access to government information, the Constitution does not impose "an *affirmative*

duty on the part of the government to assist in that research or to disclose government files ... [such] interests are statutory in nature." *Wolfe v. Froehlke*, 358 F.Supp. 1318, 1321 (D.D.C.1973), *aff'd per curiam*, 510 F.2d 654 (D.C.Cir.1974) (no first amendment right of access to a Department of Defense file that was exempt from mandatory statutory disclosure under Freedom of Information Act). *See also Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965) ("the right to speak and publish does not carry with it the unrestrained right to gather information"). In short, it is one thing to say that the government may not restrict the plaintiffs from telling the news to their readers, and quite another to argue that the government has a constitutional duty to supply the plaintiffs with the news to write about.[9] It is for Congress to establish the extent of access to the government documents; the first amendment does not do so. For example, in *Capital Cities Media v. Chester*, 797 F.2d 1164, 1168–71 (3d Cir.1986) (en banc), the court held that a newspaper had no first amendment right of access to documents maintained by a state governmental agency. Relying on *Houchins* and *Zemel*, the court reasoned that setting the scope of access to government documents is a legislative choice to which the first amendment does not speak. *See Chester*, 797 F.2d at 1170. Similarly, in *Gregg v. Barrett*, 771 F.2d 539 (D.C.Cir.

---

7. *See id.* at 553 ("I learned a long time ago that there are affirmative and negative words. The beginning of the first amendment is that 'Congress shall make no laws.'").

8. Chief Justice Burger wrote the opinion of the Court, joined by Justices White and Rehnquist. Two justices did not participate in the decision, and Justice Stewart agreed that "[t]he first and fourteenth amendments do not guarantee the public a right of access to information generated or controlled by government, nor do they guarantee the press any basic right of access superior to that of the public generally." *Id.* 438 U.S. at 16, 98 S.Ct. at 2597 (Stewart, J., concurring). *See also* Stewart, "or of the press", 26 Hastings L.J. 631, 636 (1975) ("there is no constitutional right of access to particular government information, or to require openness from the bureaucracy"). Thus, a majority of justices rejected the claim of any constitutional right of access to government information.

9. The court views the present case analogous to an Iowa newspaper's request that the White House make available for copying the written speech from which the President gave a speech. A reporter from that newspaper has *access* to the source of information (the President giving the speech in public), but the government is under no constitutional obligation to make the Iowa newspaper's job easier, however convenient it may be, by making available for copying the President's written speech. The White House, of course, often does just that. But, surely, no one would contend that the first amendment requires the President to make his written speeches available for the press to copy. This court does not believe that our constitutionally guaranteed right to free speech would crumble if ever the USIA provided access to transcripts for copying. Yet, the court also does not believe the first amendment compels such action.

1985), the court held that there is no first amendment right to receive verbatim transcripts of congressional proceedings. In *Gregg*, the court distinguished between third-party speech, which the government generally may not suppress, and government speech (i.e., access to government information), which is peculiarly a decision for Congress. *Id.* at 548. *See also Herald Co. v. McNeal*, 511 F.Supp. 269, 273 (E.D. Miss.1981) (three-judge court) (no first amendment right of access to all sources of information within government control); *Trimble v. Johnston*, 173 F.Supp. 651, 655–56 (D.D.C.1959) (reporter had no right to inspect and copy Senate documents because there was no statutory authority to do so and no such right of access under the first amendment; "the liberty of the press does not include any legal right of securing assistance from public officials in procuring information that it desired to print"); *compare Lundberg v. West Monona Community School Dist.*, No. C 89–4039 (N.D. Iowa May 19, 1989) (rejecting claim of first amendment right to force state school to provide stage for plaintiffs to express religious views: "Plaintiffs' right to free speech, while a precious right, is not so powerful as to call for the resources of the state to further that right").

■ In 1978, a citizen filed a Freedom of Information Act (FOIA) request with the USIA for a transcript of a Voice of America broadcast. When the USIA turned down his request based upon section 501 of the Smith–Mundt Act, he filed a suit in federal court, in many respects identical to the present action. *See Smith v. USIA*, No. C 76–483 (W.D.Wash.1978) (unpublished). Rejecting the plaintiff's claim that section 501 violated his first amendment rights, the court held that there is no first amendment right of access to government files. The *Smith* court correctly recognized that access to USIA materials, like the access to any government information, is a question for Congress devoid of constitutional implications:

> If the court were to adopt plaintiff's view of the first amendment, there would be little need for the Freedom of Information Act ... Plaintiff's reading of the first amendment would seem to require the government to compile, transcribe, and make available to *any* requesting party *any* communication it makes to an outside person or persons. Carried to its logical end, plaintiff could conceivably compel disclosure of all intragovernmental communication and procedures as well. "The right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17, 85 S.Ct. 1271, 1281, 14 L.Ed.2d 179 (1965).

*Smith*, C 76–483, at 3. It was thus well settled that access to government documents (aside from the question of access relating to criminal trials, historically made public by the sixth amendment) is a choice for the legislature, and not one the Constitution mandates.

Apparently recognizing that there is no constitutional right to obtain government documents, plaintiffs conceded at oral argument that they do not seek a declaration that the agency must send them copies of USIA transcripts. (Transcript of Oral Argument at 21.) Rather, they argue that once Congress has given them a statutory right to "examine" the documents, the Constitution mandates that they be permitted to make verbatim copies of the documents while on agency premises.

■ Plaintiffs have not, however, distinguished the case law establishing that the extent of access to government documents and information raises no constitutional issue, nor have they cited any cases suggesting that when Congress elects to allow some access to government documents or information, they must provide unrestricted access. To the contrary, the cases suggest otherwise. In *Houchins*, for example, the government allowed the press limited access to government information—reporters could tour the jail but could not bring in cameras or tape recorders, or interview inmates. 438 U.S. at 5, 98 S.Ct. at 2591. The Supreme Court noted that the press was able to get the information it sought through less convenient means, such as receiving letters from inmates. *Id.* at 15,

98 S.Ct. at 2597. Similarly, the press and public here may obtain verbatim transcripts of USIA broadcasts through less convenient channels such as receiving the broadcasts in other countries. Where the issue is convenience of access, the Court has held that:

> [t]here is no discernible basis for a constitutional duty to disclose, or for standards governing disclosure of or access to information. Because the Constitution affords no guidelines, absent statutory standards, hundreds of judges would, under the court of appeals approach [ordering the government to allow the press to bring in cameras, tape recorders, and to conduct interviews], be at large to fashion ad hoc standards, in individual cases, according to their own ideas of what seems "desirable" or "expedient."

*Id.* at 14, 98 S.Ct. at 2596. *See also Gregg*, 771 F.2d 539 (no first amendment right to verbatim copies of congressional transcripts).

While reporters today may use lap-top computers and other technological advancements in addition to tape recorders and cameras, the lesson of *Houchins* is that a court must respect the statutory limitation of "examination only" and not "fashion ad hoc standards" of increased access based on what may be "expedient." [10] "We must not confuse what is 'good,' 'desirable,' or 'expedient' with what is constitutionally commanded by the first amendment. To do so is to trivialize constitutional adjudication." *Houchins*, 438 U.S. at 13, 98 S.Ct. at 2596. The court concludes, therefore, that Congress may constitutionally limit access to government information to "examination only," in that the plaintiffs, accordingly, have no first amendment right to make verbatim copies of USIA materials at USIA offices.

### B. Section 501 Prohibition Against Dissemination of Information Within the United States.

■ Plaintiffs initially have the burden of demonstrating that this court has jurisdiction over their claim. "The jurisdictional power of the United States defined by article III is not an unconditioned authority to determine the constitutionality of legislative or executive acts." *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). Thus, the plaintiffs are required to show that they " 'personally ha[ve] suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.' " *Id.* 454 U.S. at 471–72, 102 S.Ct. at 758 (*quoting Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979)). This requirement ensures that issues of constitutionality are resolved only in the context of a concrete factual dispute, not on hypothetical factual scenarios. *Valley Forge*, 454 U.S. at 472, 102 S.Ct. at 758; *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 72, 98 S.Ct. 2620, 2629, 57 L.Ed.2d 595 (1978); *Aetna Life Insur. Co. v. Haworth*, 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937).

■ Thus, the Supreme Court has repeatedly held that a federal court cannot

---

10. It is interesting to note that in another context, involving copyrights, the Supreme Court and Congress have recognized a distinction between the reporting of facts contained in a work and quotation of excerpts of the work. *Harper and Rowe Publishers v. Nation Enters.*, 471 U.S. 539, 548, 550, 105 S.Ct. 2218, 2224, 2225, 85 L.Ed.2d 588 (1984). While there is no copyright interest in government works (although some of the program materials disseminated abroad by the agency are protected by private copyrights), the "fair use" doctrine in copyright law illustrates that there is nothing arbitrary about distinguishing between the right of the press to report facts (i.e., to take notes on USIA materials and report to the public what the USIA is telling the world) and any "right" of the press to reprint the work in its entirety. In any event, the media's right to publish is not before the court in this action because the controversy is simply whether the government is constitutionally required to allow the public to make verbatim copies of government documents on government premises. There is no case or controversy as to plaintiffs' ability to publish verbatim transcripts already in their hands. *See infra* Part II(B).

exercise jurisdiction unless the plaintiff has:

> sustained or is immediately in danger of sustaining some direct injury as a result of the challenged statute or official conduct. *Massachusetts v. Mellon*, 262 U.S. 447, 488 [, 43 S.Ct. 597, 601, 67 L.Ed. 1078] (1923). The injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical." *Golden v. Zwickler*, 394 U.S. 103, 109–110 [, 89 S.Ct. 956, 960, 22 L.Ed.2d 113] (1969); *Maryland Casualty Co. v. Pacific Coal and Oil Co.*, 312 U.S. 270, 273 [, 61 S.Ct. 510, 512, 85 L.Ed. 826] (1941); *United Public Workers v. Mitchell*, 330 U.S. 75, 89–91 [, 67 S.Ct. 556, 564–65, 91 L.Ed. 754] (1947).

*O'Shea v. Littleton*, 414 U.S. 488, 494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974). This constitutional requirement of an immediately threatened, direct injury also applies to an action for a declaratory judgment.[11]

 It is also settled that the Article III requirement of an actual, concrete injury applies to first amendment challenges. *See, e.g., Martin Tractor Co. v. Federal Election Comm'n*, 627 F.2d 375 (D.C.Cir.) (first amendment action seeking declaratory and injunctive relief against election laws held nonjusticiable because there is no threat of enforcement), *cert. denied*, 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 218 (1980); *St. Martin's Press v. Carey*, 605 F.2d 41 (2d Cir.1979) (first amendment challenged criminal statute governing child por-

nography dismissed on ground that there is no case or controversy because plaintiffs had not been prosecuted or threatened with prosecution); *NTEU v. Kurtz*, 600 F.2d 984, 988–89 (D.C.Cir.1979) (first amendment challenge to a regulation providing disciplinary sanctions for employee speech dismissed for lack of case or controversy because no employee had ever been subjected to sanctions); *Farrakhan v. Reagan*, 669 F.Supp. 506, 509–10 (D.D.C.1987) (first amendment challenge to travel restrictions dismissed for lack of standing because of the threat of arrest or prosecution was speculative), *aff'd mem.*, 851 F.2d 1500 (D.C.Cir.1988); *Citizens Action Coalition of Indiana v. Westfall*, 582 F.Supp. 11, 16 (S.D.Ind.1983) (dismissing first amendment challenge to ordinance barring certain door-to-door solicitation because enforcement was unlikely); *Poe v. City of Humble*, 554 F.Supp. 233, 235–36 (S.D.Tex. 1983) (dismissing as not ripe and for lack of standing first amendment challenge to religious solicitation ordinance because there was no imminent threat of prosecution). The mere existence of a statute, therefore, does not create a "case or controversy" necessary for federal court jurisdiction unless the party seeking to invoke federal judicial power has sustained, or is in immediate danger of sustaining, a direct injury which the enforcement of the statute has or may cause. *See also Laird v. Tatum*, 408 U.S. 1, 13, 92 S.Ct. 2318, 2325, 33 L.Ed.2d 154 (1972).[12]

**11.** *See Zwickler*, 394 U.S. at 108, 89 S.Ct. at 959; *Mitchell*, 330 U.S. at 89, 67 S.Ct. at 564; *Maryland Casualty*, 312 U.S. at 273, 61 S.Ct. at 512; *Ashwander v. TVA*, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936); *Vorbeck v. Schnicker*, 660 F.2d 1260, 1265 (8th Cir.1981), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1982).

**12.** It is also well established that a court should not rule on an issue of constitutional law if a case can be decided on other grounds. *Ashwander v. TVA*, 297 U.S. 288, 346, 56 S.Ct. 466, 482, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Communist Party of the United States v. Subversive Activities Control Bd.*, 367 U.S. 1, 71–72, 81 S.Ct. 1357, 1397, 6 L.Ed.2d 625 (1961); *Umpleby v. United States*, 806 F.2d 812, 813 (8th Cir. 1986); *Beeson v. Hudson*, 630 F.2d 622, 627 (8th Cir.1980); *United States v. Eagle*, 539 F.2d 1166, 1172 n. 6 (8th Cir.1976), *cert. denied*, 429 U.S.

1110, 97 S.Ct. 1146, 51 L.Ed.2d 563 (1977); *Sullivan v. Meade Independent School Dist.*, 530 F.2d 799, 805 (8th Cir.1976); *In re Weitzman*, 426 F.2d 439, 455 (8th Cir.1970); *Brown v. Donielson*, 334 F.Supp. 294, 304 (S.D. Iowa 1971).

Specifically, the court must adopt any "fairly plausible" narrowing construction of the statute in order to avoid striking it down on first amendment grounds. *Boos v. Barry*, 485 U.S. 312, 108 S.Ct. 1157, 1169, 99 L.Ed.2d 333 (1988). *See also Lowe v. SEC*, 472 U.S. 181, 204, 205 n. 50, 105 S.Ct. 2557, 2569, 2570 n. 50, 86 L.Ed.2d 130 (1985) (noting that Congress is aware of the prohibition against prior restraints, the court construes statute regulating speech as not applying to press); *Littlefield v. Fort Dodge Messenger*, 614 F.2d 581, 585 (8th Cir.) (court construes rule governing confidentiality information as not applying to the press because otherwise "it would constitute a constitutionally suspect prior

Thus, this court has previously stated that it is not empowered to

> pass judgment upon the constitutionality of [a statute] unless that judgment is needed to protect these plaintiffs from an imminent injury or to remedy a past injury. If the threat of prosecution or any other injury is merely speculative, their claim for protection is not ripe.

*Trucke v. Erlemeier,* 657 F.Supp. 1382 (N.D. Iowa 1987) (footnote omitted). *See also United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1380 (D.C.Cir.1984) (no standing where plaintiffs "have not adequately averred that any specific action is threatened or even contemplated against them"). It is with these principles in mind that the court must determine whether there is a present injury and a ripe case of controversy as to the plaintiffs' ability to speak.

Aside from the question whether the plaintiffs are entitled to make verbatim copies of USIA documents on USIA premises (which, as the court discussed previously, is a question of access, not speech), nothing in the record suggests that the defendant has taken any action of any kind against the plaintiffs.[13] Indeed, plaintiffs' supporting papers [14] demonstrate that Plaintiff Gartner has examined USIA materials at the agency offices and has quoted from USIA materials in a speech. Nothing in the record suggests that anyone, least of all the USIA, punished or threatened to punish Mr. Gartner for this speech. To the contrary, the agency states that Mr. Gartner's speech was consistent with Congress' intent to create media and public oversight of the USIA.

### 1. *Risk of Sanctions.*

In their attempt to establish standing, plaintiffs cite cases in which a speaker was arrested, convicted, or subject to arrest or criminal prosecution. These cases are currently distinguishable from the case at bar because there is no possibility of criminal prosecution.[15] The Court of Appeals for

restraint on publication"), *cert. denied,* 445 U.S. 945, 100 S.Ct. 1342, 63 L.Ed.2d 779 (1980).

**13.** The record reveals only a letter which a Voice of America public information officer wrote to Plaintiff Gartner in response to Mr. Gartner's inquiry whether he could "xerox" USIA materials and reprint them in his newspapers. The VOA officer responded that Mr. Gartner was not free to do so. Plaintiffs claim that *the import of the letter is that Mr. Gartner is not* free to reprint any information from USIA broadcasts in his newspaper, while the agency contends that the sole effect of the letter was to advise Mr. Gartner that he could not make copies of USIA materials at USIA offices. Were it necessary for the court to reach this issue, it would find that the letter did not purport to restrict Mr. Gartner from printing any information from USIA broadcasts (including quotations) in his newspaper, but merely advised Mr. Gartner that the agency would not let him make xerox copies of broadcasts in the agency's offices that he could take with him.

It is not necessary for the court to reach this issue, however, because the VOA officer, regardless of what she may have meant, cannot estop the USIA from today clarifying that it does not regulate Mr. Gartner in any way once he leaves the USIA offices. Nor can the letter, by itself, serve as the basis for a standing absent some action taken by the agency against Mr. Gartner. *See Ashwander v. TVA,* 297 U.S. 288, 324, 56 S.Ct. 466, 472, 80 L.Ed. 688 (1936); *Helco Products Co. v. McNutt,* 137 F.2d 681, 683 (D.C.Cir.

1943) (no jurisdiction over declaratory judgment action where agency commissioner answered plaintiff's question, because "an advisory opinion, in answer to a hypothetical question, does not foreclose a contrary conclusion by [the agency] upon an actual state of facts"); *NTEU v. Kurtz,* 600 F.2d 984, 989 (D.C.Cir.1979) (memorandum to plaintiffs that restated a rule regarding dissemination of information but did not mention penalties or punishment cannot serve as a basis for claiming a present case or controversy in a first amendment challenge); *cf. Red River Transport Co. v. FAA,* 630 F.2d 592 (8th Cir.1980) (letter from FAA inspector advising carrier that it may have violated regulation was not "final agency action" subject to judicial review).

**14.** Plaintiffs attached to their reply to defendants' response to plaintiffs' resistance to motion to dismiss over 100 pages of copies of letters, newspaper editorials, etc., but did not give them exhibit numbers for references.

**15.** *E.g., Landmark Communications v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978) (publisher criminally convicted for publishing information regarding disciplinary proceedings); *Cox Broadcasting Corp. v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) (statute allowing for criminal prosecution if press publishes rape victim's name obtained from judicial records); *Epperson v. Arkansas,* 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (teaching of

the Eighth Circuit has recently recognized that "[p]laintiffs need not expose themselves to actual arrest or prosecution if they legitimately possess more than an 'imaginary or speculative' fear of prosecution." *United Food and Chemical Workers Int'l Union v. IBP*, 857 F.2d 422, 427 (8th Cir.1988) (citations omitted); *cf. Trucke*, 657 F.Supp. at 1386 (claim is not ripe if threat of injury is speculative). But the statute plaintiffs challenge in this action is neither a criminal statute nor one that provides for civil sanctions. Any fear of arrest, prosecution, or other sanctions on the part of the plaintiffs is thus "imaginary and speculative" and insufficient to confer standing under the test set out in *United Food.*

### 2. *Chilling Effect.*

 Nor can plaintiffs satisfy the injury-in-fact component of standing by arguing that section 501 has "chilled" their right to speak. It is now well settled that a claim that speech has been "chilled" is insufficient to establish standing, absent independent, concrete harm. *See Laird v. Tatum*, 408 U.S. at 13–14, 92 S.Ct. at 2325–26; *Wade v. Goodwin*, 843 F.2d 1150 (8th Cir.1988); *United Presbyterian Church*, 738 F.2d at 1378–80 (Scalia, J.);[16] *St. Martin's Press v. Carey*, 605 F.2d 41 (2d Cir. 1979); *Farrakhan v. Reagan*, 669 F.Supp. 506 (D.D.C.1987); *Citizens Action Coalition of Indiana v. Westfall*, 582 F.Supp. 11 (S.D.Ind.1983).

### 3. *Prior Restraints.*

In attempting to establish a real injury, plaintiffs also cite cases involving "prior restraints" of speech which challenges even where there was no possibility of criminal prosecution. In this line of cases, however, unlike the case at bar, the government had actually brought an action to enjoin speech, or had imposed a requirement of advance censorship, approval, licensing, or taxation of speech. *See, e.g., New York Times v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (action by United States to enjoin publication of classified material); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 91 S.Ct. 1575, 29 L.Ed.2d 1 (1971) (injunction against distribution of literature); *Times Film Corp. v. City of Chicago*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961) (pre-exhibition censorship of films);[17] *Grosjean v. American Press Co.*, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) (licensing tax on newspapers with large circulation); *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931) (judicial order of court perpetually enjoining publication which was critical of government); *Stacy v. Williams*, 306 F.Supp. 963 (N.D. Miss.1969) (speakers denied permission to speak based on regulations prohibiting speech by, among others, persons in disrepute and political candidates).

In the case at bar, no one has enjoined plaintiffs from speaking, nor has anyone subjected them to advance censorship, licensing, or taxation. Indeed, defendant states that it is unaware of any action taken to enjoin dissemination of agency materials by the press in the 41–year history of section 501. Because USIA does not purport to have authority to approve or

---

evolution constituted a criminal misdemeanor); *Mills v. Alabama*, 384 U.S. 214, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966) (statute under which newspaper editor was arrested for publishing election day editorial); *Bantam Books v. Sullivan*, 372 U.S. 58, 83 S.Ct. 631, 9 L.Ed.2d 584 (1963) (threats of criminal prosecution used to suppress publications); *Neiderhiser v. Borough of Berwick*, 840 F.2d 213 (3d Cir.) (criminal ordinance barring sale of pornography; case or controversy present because of viable claim for monetary damages), *cert. denied*, —— U.S. ——, 109 S.Ct. 67, 102 L.Ed.2d 44 (1988); *International Society for Krishna Consciousness v. Eaves*, 601 F.2d 809 (5th Cir.1979) (ordinance publishing speech without permit).

**16.** Judge Scalia explained that the doctrine of "chilling effect" merely allows one party who has suffered a concrete injury to allege injury on behalf of others who have not. *Id.* at 1378–80. Plaintiffs themselves must suffer a concrete injury apart from any alleged "chill." *Id.*

**17.** In *Times Film Corp.*, exhibition of a film without prior approval also carried with it a monetary fine. *Times Film Corp. v. City of Chicago*, 272 F.2d 90, 91 (7th Cir.1959), *aff'd*, 365 U.S. 43, 81 S.Ct. 391, 5 L.Ed.2d 403 (1961).

disapprove of what the plaintiffs say in public,[18] has not brought an action to enjoin their speech, and has no authority to censor their speech, this case plainly does not involve a "prior restraint" of speech.

### 4. *Congressional Intent.*

■ Plaintiffs also contend that there is a present case or controversy concerning their ability to speak because Congress, in 1972, amended section 501 to "overrule" a decision by the Department of Justice not to commence civil action to enjoin a showing of a USIA film on United States television. S.Rep. No. 92–754, 92d Cong., 2d Sess., 82–85 (1972). The court cannot, however, review the constitutionality of the statute, as amended, absent a showing by the plaintiffs of some type of enforcement action or other concrete injury. Even if Congress may have intended that the Department of Justice bring an action for injunctive relief under those circumstances, it still does not give rise to a controversy between these parties unless the agency takes some action against the plaintiffs.

Nevertheless, even if the issue of Congress' intent were necessary to the court's decision, it is apparent that Congress did not intend to regulate the speech of the plaintiffs. The 1972 amendment grew out of a controversy in which a United States senator planned to show a USIA film to his constituents on United States television. Another member of Congress requested that the Department of Justice enjoin the showing, but Acting Attorney General Kleindeinst refused on two grounds: first, because he concluded that section 501, as originally written, did not explicitly preclude members of Congress from disseminating USIA materials; and, second, because the Supreme Court's decision in *New*

York Times v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), cast doubt on whether the Department of Justice "could or should obtain a court order restraining the proposed showing...." S.Rep. No. 92–754 at 84–85.

■ While a cursory glance at the legislative history might suggest that Congress then "overruled" the decision of the Acting Attorney General by amending section 501, a closer look at the legislative history and the actual language Congress adopted demonstrates that Congress did not give the agency any authority to monitor, censor, approve, or penalize public speech. Congress merely confirmed that access to USIA documents would be allowed "for examination only" in the agency's office, and even expanded public oversight of USIA broadcasts beyond the press and members of Congress to include scholars. While the plaintiffs note that the Senate apparently intended to enact a sweeping ban on all public dissemination of agency materials, *id.* at 85, the House agreed to the Senate amendment only after it was further amended to ensure access to materials by research students and scholars. Conference Rep. No. 92–1145, 92d Cong., 2d Sess. 16 (1972).

Thus, while the Buckley amendment restricts public access to "examination only," Congress reconfirmed that the press was to continue to have access to the documents, as it had since 1948, and expanded access to "research students and scholars."[19] Plaintiffs are unable to explain why Congress would so carefully have preserved the oversight rule of the press and public had it intended to prevent them from speaking once they had examined USIA documents.[20] Congress knows how to bar

---

**18.** The agency advises persons who examine agency materials that they should not make copies of the materials, but the extent of access to the materials in the agency's offices does not involve a "free speech" issue. *See supra* Part II(A). There is no allegation that the agency reads or censors any notes that members of the public take from the documents, and the agency states that it does not do so.

**19.** The USIA allows *any* requests, without regard to the person's credentials, to examine

USIA documents because of the difficulty to determine who is qualified as a "research student" or "scholar." While plaintiffs apparently object to this broadened interpretation, the agency's decision to allow access to all persons certainly violates no right of the plaintiffs.

**20.** For the same reason, this court rejects plaintiffs' suggestion that the statutory language "shall not be disseminated within the United States" refers to speech by the press and general public. In context, it is reasonable to construe

or penalize public dissemination of documents, but did not do so here. *See New York Times*, 403 U.S. at 743–44 and n. 3, 91 S.Ct. at 2156 and n. 3 (Marshall, J., concurring) (noting that Congress knows how to provide penalties for public disclosure of government documents and citing numerous statutory examples).

Plaintiffs fear that some future administration might some day take action against them for "disseminating" USIA information is precisely the type of speculative and hypothetical controversy barred by article III. Should the USIA some day attempt to enjoin speech pursuant to section 501 (which is the only action it could ever take under section 501), the plaintiffs would then have ample opportunity to defend their right to speak. Until such time, however, any injury to the plaintiffs' ability to speak is purely hypothetical and speculative. *See Brown v. Donielson*, 334 F.Supp. 294 (S.D. Iowa 1971).

The court does not question the vigor with which the plaintiffs contend that section 501 is unconstitutional, but article III of the Constitution requires a concrete, factual controversy to invoke the jurisdiction of the courts, and prevents this court from "advising what the law would be upon a hypothetical state of facts." *Aetna Life*, 300 U.S. at 240–41, 57 S.Ct. at 463–64. Moreover, while defendant vigorously defends Congress' limitation on access to USIA documents, it nowhere claims a right to restrict the plaintiffs' speech or to regulate the plaintiffs in any forum outside the confines of the USIA offices. The court concludes, therefore, that the plaintiffs have not alleged any concrete, present injury, save whether they are entitled to make copies of USIA documents at the USIA offices. Where, as here, the USIA has given every indication that the plaintiffs are free to publish as they please, and has neither taken action nor threatened to take

action to enjoin or penalize the plaintiffs' speech, this court "adheres to the principle that a defendant will not be enjoined from doing what [it] is not attempting to do." *St Martin's Press*, 605 F.2d 41, 45, n. 4 (2d Cir.1979) (citation omitted). It would be easy to conclude that USIA's position is "inappropriate or even stupid," but based upon the record, this court concludes that neither the statute, nor the USIA's interpretation of the statute, is unconstitutional.

### III. CONCLUSION

Upon the foregoing;

IT IS HEREBY ORDERED that plaintiffs' motion for summary judgment is denied and defendant's motion to dismiss is granted. Plaintiffs have not demonstrated a concrete injury or controversy as to their ability to speak, and they have no constitutional right to make verbatim copies of the agency's documents at the agency's offices.

---

this clause as referring only to the Director of the USIA, whose duties are set forth in the preceding sentence. As noted, the court must adopt any "fairly plausible" statutory construction to avoid striking down a statute on first amendment grounds. *See supra* note 12. The narrowing construction here is not only a plausible reading of the statutory language, but the only construction that is consistent with Con-

gress' intention to create immediate oversight of the USIA broadcasts. A ruling that Congress intended to "gag" the media from reporting criticism of USIA broadcasts would defy Congress' intention, as stated in the original 1948 legislation and as reconfirmed in subsequent amendments, that the public and media should oversee the USIA by examining its materials.