Stanley R. HENDRICKSON, Petitioner,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, Respondent.

No. 96–3098.

United States Court of Appeals, Seventh Circuit.

Argued March 31, 1997.

Decided May 7, 1997.

Bernard L. Pylitt (argued), Katzman, Katzman & Pylitt, Indianapolis, IN, for Petitioner.

Arthur L. Beamon, Gregory E. Gore (argued), Timothy E. Divis, Federal Deposit Insurance Corporation, Division of Depositor & Assets Services, Chicago, IL, Jerry Langley, Federal Deposit Insurance Corporation, Office of the Executive Secretary, Washington, DC, for Respondent.

Before FLAUM, KANNE, and ROVNER, Circuit Judges.

FLAUM, Circuit Judge.

Section 6050I of the Internal Revenue Code, 26 U.S.C. § 6050I, and regulations promulgated thereunder require businesses to file a document called a Form 8300 whenever they receive more than ten thousand dollars in cash in a single transaction. In 1993, Stanley Hendrickson, president of the Randolph County Bank of Winchester, Indiana (the "Bank"), pleaded guilty to willfully failing to file a Form 8300 while em-

ployed as comptroller of his brother's coin and precious metal dealership, Silver Towne. Hendrickson had left Silver Towne in 1992 to become president of the Bank, where he previously had worked from 1962 until 1985. In 1996, despite Hendrickson's years of service and the wishes of certain Winchester residents who expressed the desire to keep their hometown bank president, the Board of Directors of the Federal Deposit Insurance Corporation (the "Board") ordered Hendrickson removed from his job and prohibited him from further involvement in banking. We affirm the Board's order.

## I.

It may well be that Hendrickson never would have run into trouble had he stayed at the Bank. In 1985, however, he left to become the comptroller at Silver Towne, a proprietorship wholly owned by his brother, Leon, and managed by Leon's son, David. In February 1990, while attending a coin show in California, David and Leon met a man named Robert McGuinn, who presented himself as an agent of the Manhattan Coin Company, but who in reality was a money launderer connected to a Colombian drug cartel. McGuinn bought $50,000 worth of gold bullion from the father and son, to whom he paid cash, and arranged for future purchases of gold shot (gold in pellet form) from Silver Towne. Over the next two months, eleven transactions took place between McGuinn and Silver Towne, and, by April 19, McGuinn had bought more than a million dollars worth of gold shot. McGuinn's payments, the smallest of which was $28,000, often arrived at Silver Towne in pails lined with garbage bags filled with small bills.

Stanley Hendrickson did not learn of the McGuinn sales until mid-April, when he asked his nephew about what appeared to be a large surplus of cash. At this point, David supplied the missing invoices for the McGuinn transactions, and Stanley made two lump-sum entries in Silver Towne's ledgers to reflect the sales. Stanley also began filling out a Form 8300 to report the transactions, but apparently abandoned the task in the absence of required information about McGuinn. There was cause for concern, therefore, when, in October 1991, the IRS informed Silver Towne that the business would be audited as part of a state-wide sweep aimed at checking compliance with section 6050I. The Hendricksons met with their accountant and decided that Stanley would prepare a back-dated Form 8300 and place a copy of it in Silver Towne's files to create the impression that the document had indeed been filed with the IRS. Although the ploy satisfied the IRS auditors, who were quick to assume that their agency had lost the original, it did not fool the IRS Criminal Investigation Division, which by this time was investigating McGuinn for money laundering. When investigators executed a search warrant at Silver Towne two weeks after the audit, they discovered the original of the doctored Form 8300 in Stanley's desk. In July 1993, Leon pleaded guilty to money laundering and paid a criminal forfeiture of $742,555. *See United States v. Hendrickson,* 22 F.3d 170 (7th Cir.1994). David and Stanley pleaded guilty to willful failure to file a Form 8300 in violation of 26 U.S.C. § 7203, David to eight counts and Stanley to one.

In the meantime, and with the Bank fully aware of his legal difficulties, Stanley returned to the Bank in November 1992 as its president and a director. On April 25, 1994, the FDIC initiated this action pursuant to section 8(e)(1) of the Federal Deposit Insurance Act ("FDIA"), 12 U.S.C. § 1818(e)(1), to remove Hendrickson from office and to prohibit him from further participation in banking. Although an administrative law judge recommended, both as a matter of law and as a matter of discretion, that Hendrickson not be removed or prohibited from banking, the Board rejected this recommendation. Hendrickson now petitions for review of the Board's order.

## II.

■ Hendrickson's first argument to this court is that, because the Board's removal order was untimely under the applicable statute and regulations, the Board lacked jurisdiction to issue the order. Section 1818(h)(1) of Title 12 specifies that "within ninety days after the appropriate Federal banking agen-

cy ... has notified the parties that the case has been submitted to it for decision, it shall render its decision ... and shall issue and serve upon each party to the proceeding an order ... consistent with the provisions of this section." Likewise, the FDIC's Uniform Rules of Practice and Procedure provide that the Board "shall render a final decision within 90 days after notification of the parties that the case has been submitted for final decision." 12 C.F.R. § 308.40(c)(2). Here, the Assistant Executive Secretary of the FDIC notified the parties on April 24, 1996 that Hendrickson's case had been submitted to the Board. Although the Board's decision and order removing Hendrickson from the Bank apparently was adopted at a meeting of the Board held July 16, 1996, the transmittal letter accompanying the order is dated August 6, and Hendrickson claims that his counsel was not served with a copy of the order until August 9. Service of the order thus fell outside the prescribed ninety-day period, and Hendrickson reasons that "the FDIC is now stuck with [its] own Administrative Law Judge's Opinion, Findings of Fact, and Decision which dismissed the removal petition."

We disagree. With respect to statutory deadlines, a trilogy of Supreme Court decisions has established "that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction," *United States v. James Daniel Good Real Property,* 510 U.S. 43, 63, 114 S.Ct. 492, 506, 126 L.Ed.2d 490 (1993). *See id.* at 62–65, 114 S.Ct. at 505–07 (timing of forfeitures under customs laws); *United States v. Montalvo–Murillo,* 495 U.S. 711, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990) (timing of hearing under Bail Reform Act); *Brock v. Pierce County,* 476 U.S. 253, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986) (timing of Secretary of Labor's investigation of misuse of Comprehensive Employment and Training Act funds). Standing alone, moreover, use of the word "shall" in connection with a statutory timing requirement has not been sufficient to overcome the presumption that such a deadline implies no sanction for an agency's failure to heed it. *See Montalvo–Murillo,* 495 U.S. at 718, 110 S.Ct. at 2077–78; *Brock,* 476 U.S. at 262, 106

S.Ct. at 1840; *Brotherhood of Ry. Carmen Div. v. Pena,* 64 F.3d 702, 704 (D.C.Cir.1995). Rather, the general rule is that "Government agencies do not lose jurisdiction for failure to comply with statutory time limits unless the statute *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision." *Brock,* 476 U.S. at 259, 106 S.Ct. at 1838 (emphasis in original) (citations and internal quotations omitted).

In the instant case, however, Hendrickson points not only to a statutory timing requirement, but also to the FDIC's own rules of procedure. He observes that, in addition to the ninety-day requirement of 12 C.F.R. § 308.40, the Uniform Rules prescribe the means by which their time limits may be altered. Under 12 C.F.R. § 308.13, the Board "may grant extensions of the time limits for good cause shown. Extensions may be granted at the motion of a party or of the Board ... after notice and opportunity to respond is afforded all non-moving parties, or on the administrative law judge's own motion."

We need not decide whether this extension provision is applicable in the circumstances presented here, for we believe that the more relevant question is whether the regulations mandate a consequence for the Board's failure to render a decision within ninety days after the case had been submitted to it for decision. We agree with our sister courts of appeals that have held that, absent a clear indication to the contrary, regulatory deadlines, like statutory deadlines, provide no remedy for their own violation. As the District of Columbia Circuit has noted, "[a]n agency ... is presumably no more inclined than Congress to place constraints on administrative action, especially when it is its own." *Brotherhood of Ry. Carmen,* 64 F.3d at 704. Moreover, we believe that a due regard for the public welfare "'forbids that the public interests should be prejudiced by the negligence of the officers or agents to whose care they are confided,'" *Brock,* 476 U.S. at 260, 106 S.Ct. at 1839 (quoting *United States v. Nashville, C. & St.*

*L. Ry. Co.*, 118 U.S. 120, 125, 6 S.Ct. 1006, 1008, 30 L.Ed. 81 (1886)); *see also Oy v. United States,* 61 F.3d 866, 871 (Fed.Cir. 1995) (quoting same). The deadline involved here, for example, may well be designed to ensure prompt removal of untrustworthy banking officials, rather than to safeguard the rights of parties subject to a removal proceeding. It would be anomalous, to say the least, for Hendrickson to reap the windfall of dismissal as a result of the Board's relatively minor delay.[1]

In sum, we hold that an agency does not lose jurisdiction for failure to adhere to a regulatory deadline unless the regulation in question *"both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision." *Brock,* 476 U.S. at 259, 106 S.Ct. at 1838. Hendrickson has directed us to no provision, either statutory or regulatory, indicating that the Board loses its power to act after ninety days from the time of submission of a case for final decision. We therefore reject his con-

tention that the Board lacked jurisdiction when it issued its order of removal.

## III.

We turn, then, to Hendrickson's claim that the FDIC did not make the showing required by section 8(e)(1) of the FDIA, 12 U.S.C. § 1818(e)(1).[2] Hendrickson does not challenge the Board's finding with respect to subparagraph (A) of section 1818(e)(1), for it is undeniable that, by failing to file the Form 8300 and then falsifying Silver Towne's files, he both violated "a law or regulation," § 1818(e)(1)(A)(i)(I), and participated in an "unsafe or unsound practice," § 1818(e)(1)(A)(ii).[3] The controversy, then, turns on whether the Board correctly determined that subparagraphs (B) and (C) had been satisfied. We review the Board's decision in this regard only to ensure that it is not arbitrary or capricious and that the Board's factual findings are supported by substantial evidence. *See* 12 U.S.C. § 1818(h)(2) (incorporating standard of review applicable under 5 U.S.C. § 706).

---

**1.** This is not to say that individuals aggrieved by an unreasonable administrative delay are without remedy. As the Supreme Court noted in Brock, assuming standing requirements are met, the Administrative Procedure Act authorizes actions to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1). *See* 476 U.S. at 260 n. 7, 106 S.Ct. at 1839 n. 7. In addition, the FDIA permits officials who have been suspended from office pending final action by the Board to seek a stay of suspension in the district court. *See* 12 U.S.C. § 1818(f); *Boberski v. Ryan,* 793 F.Supp. 170 (N.D.Ill.1992).

**2.** In pertinent part, section 8(e)(1) provides as follows:

**(1) Authority to issue order.** Whenever the appropriate Federal banking agency determines that—

(A) any institution-affiliated party has, directly or indirectly—

   (i) violated—

   (I) any law or regulation; [or]

    . . .

   (ii) engaged or participated in any unsafe or unsound practice in connection with any insured depository institution or business institution; . . .

    . . .

(B) by reason of the violation, practice, or breach described in any clause of subparagraph (A)—

   (i) such insured depository institution or business institution has suffered or will probably suffer financial loss or other damage; [or]

    . . .

   (iii) such party has received financial gain or other benefit by reason of such violation, practice, or breach; and

(C) such violation, practice, or breach—

   (i) involves personal dishonesty on the part of such party; or

   (ii) demonstrates willful or continuing disregard by such party for the safety or soundness of such insured depository institution or business institution,

the agency may serve upon such party a written notice of the agency's intention to remove such party from office or to prohibit any further participation by such party, in any manner, in the conduct of the affairs of any insured depository institution.

12 U.S.C. § 1818(e)(1).

**3.** Although the conduct at issue occurred before Hendrickson returned to the Bank, the Board observed "that a party is subject to the jurisdiction of section 8(e) for actions occurring at a non-insured business institution." Hendrickson does not appeal this aspect of the Board's ruling.

Hendrickson's argument that the requirements of subparagraph (C) were not met cannot be taken very seriously. Subparagraph (C) covers misconduct that "(i) involves personal dishonesty" or "(ii) demonstrates willful or continuing disregard . . . for the safety or soundness of such business institution." 12 U.S.C. § 1818(e)(1)(C). Although Hendrickson, focusing on the elements of the crime to which he pleaded guilty, argues that failing to file a return in violation of 26 U.S.C. § 7203 does not necessarily "involve[ ] personal dishonesty" within the meaning of subparagraph (C)(i), the record is clear that Hendrickson's misconduct did not end with this initial lapse. To the contrary, Hendrickson back-dated a Form 8300 and placed a copy of the document in Silver Towne's files specifically to mislead IRS auditors. This behavior clearly "involves personal dishonesty." Moreover, consistent with his conclusion that falsifying Silver Towne's records constituted an "unsafe or unsound practice" for purposes of subparagraph (A), the ALJ found, and the Board agreed, that Hendrickson's misconduct "demonstrate[d] willful . . . disregard . . . for the safety or soundness" of Silver Towne within the meaning of subparagraph (C). "[I]t can hardly be denied," the ALJ reasoned, "that business records must be kept accurately, not only for purposes of conducting the business, but also for ensuring compliance with the law." We agree.

That leaves subparagraph (B), which, in relevant part, required the FDIC to establish that Silver Towne suffered "financial loss or other damage" or that Hendrickson "received financial gain or other benefit" as a result of his misconduct. The Board concluded that both of these prongs were satisfied: Leon's forfeiture constituted a financial loss to Silver Towne for which Stanley was partly responsible, and Stanley received "financial gain or other benefit" by his deception, both because it masked his earlier failure to file the required forms and because it was motivated in part by a fear of losing his job should he defy Leon and David.

We could end our analysis with the observation that Hendrickson, on appeal, does not dispute the Board's finding that the fear of being fired motivated his decision to place the copy of the back-dated form in Silver Towne's files. To this observation we could add that Hendrickson's fraud benefited him, at least temporarily, by deceiving the IRS auditors. For the sake of completeness, however, we also address his contention that Leon's forfeiture was a loss "to Leon, and not the business, and in any event, occurred as a result of the money laundering conviction of Leon, and not the failure of the business to file the Form 8300." With regard to the attribution of the loss to Silver Towne, we agree with the Board that no meaningful distinction can be drawn between Leon Hendrickson and the business of which he was the sole owner. *See Hendrickson,* 22 F.3d at 173 ("[T]he district court noted the impact of such a large forfeiture upon both [Leon] Hendrickson and Silver Towne, a business Hendrickson had spent a 'lifetime' building."). As for Stanley's responsibility for the loss, the Board deemed it sufficient that his actions facilitated Leon's money laundering. We cannot find fault with this conclusion. Investigators did not uncover the McGuinn transactions until more than a year after they were completed. Had Stanley Hendrickson insisted on filing the Form 8300 when he learned of the transactions in April 1990, Leon and David might have been compelled to report their suspicions regarding McGuinn. Had they done so, they certainly would have appeared less culpable in the eyes of the authorities. In short, the Board's decision was not arbitrary or capricious.

Left without a statutory leg to stand on, Hendrickson maintains that the Board abused its discretion in ordering him removed and prohibited from further participation in banking. The Board articulated three reasons for declining to order a more lenient sanction: "the seriousness with which Congress views money laundering crimes," the fact that Hendrickson "engaged in premeditated dishonesty," and the fact that Hendrickson's misconduct "has a direct correlation to the bank examination process." Nevertheless, Hendrickson urges that "this case should focus on the needs of the residents of Winchester, Indiana, a very small rural community with a very high unemploy-

ment rate." Not only does Hendrickson have an unblemished record of twenty-five years of service to the Bank, but "the Bank, its Directors, employees, shareholders and depositors unequivocally and overwhelmingly support the continuation of Stanley Hendrickson as its President." The equities, in Hendrickson's estimation, therefore weigh against removal. This argument might garner more sympathy (though it would nonetheless fail) were the mismanagement of federally insured banks a problem of exclusively local dimension. Recent history amply demonstrates that it is not.

The order of the Board is AFFIRMED.