**OFFICE OF FOREIGN ASSETS CONTROL, United States Department of the Treasury, Plaintiff,**

v.

**VOICES IN THE WILDERNESS, Defendant.**

No. CIV.A. 03–1356(JDB).

United States District Court, District of Columbia.

Aug. 9, 2004.

Sara Wood Clash–Drexler, U.S. Department of Justice, Civil Division, Federal Programs Branch, Washington, DC, for Plaintiff.

William P. Quigley, Loyola University New Orleans School of Law, New Orleans, LA, Carl L. Messineo, Mara E. Verheyden–Hilliard, Partnership for Civil Justice, Washington, DC, for Defendant.

### MEMORANDUM OPINION

BATES, District Judge.

The Office of Foreign Assets Control ("OFAC") seeks judicial enforcement of civil monetary penalties assessed against Voices in the Wilderness ("Voices") for violations of the Iraqi Sanctions Regulations (the "Regulations"), 31 C.F.R. Part

575 (1991). Voices admits that it delivered medical supplies to Iraq in July and September 1998 without obtaining a license as required by the Regulations. Indeed, Voices has acknowledged its actions since at least December 1998, when it first received a warning from OFAC. However, OFAC waited three years and eleven months, until November 2002, to levy a $20,000 penalty against Voices. Voices defends on the grounds that the Regulations are illegal, that its conduct is privileged by principles of international law, and that OFAC's delay forecloses its pursuit of civil penalties under the relevant statutes. Voices also counterclaims for injunctive relief against OFAC's allegedly wrongful civil enforcement action, and for malicious and selective prosecution. OFAC has moved for judgment under FED. R. CIV. P. 12(c), and to dismiss defendant's claims for lack of subject matter jurisdiction and for failure to state a claim under Rules 12(b)(1) and 12(b)(6).

## BACKGROUND

### A. Facts

OFAC, a division of the Department of the Treasury, administers and enforces economic and trade sanctions. Voices is an unincorporated association of individuals based in Chicago, Illinois. Since 1996, Voices has "campaigned to end economic and military warfare against the Iraqi people ... by organizing over seventy delegations to Iraq in deliberate violation of UN economic sanctions and U.S. law." http://vitw.us/who_we_are/ (last visited June 29, 2004).

In January 1996, Voices sent a letter to U.S. Attorney General Janet Reno stating its intent to "publicly challenge" the Iraqi sanctions regime. Ans. & Countercl. ¶ 12. OFAC responded with a warning letter, but Voices "declared an intention to continue with the medical supplies campaign."

Ans. & Countercl. ¶ 13. Voices delegations delivered medical supplies to Iraq in July and September 1998. Ans. & Countercl. ¶¶ 14 –16. For neither of these trips did Voices obtain a license from OFAC, despite a Regulation requiring them to do so. *See* 31 C.F.R § 575.205 (1991); 31 C.F.R. § 575.211 (1991).

On December 3, 1998, OFAC issued a prepenalty notice to Voices pursuant to the Regulations. Compl. ¶ 17; Ans. & Countercl. ¶ 17. The prepenalty notice described the two alleged violations and warned of an impending fine. On December 30, 1998, Voices responded with a written presentation admitting the violations and denouncing OFAC's licensing regime. Compl. ¶ 18; Ans. & Countercl. ¶ 18. The Regulations required OFAC to respond "promptly" to Voices' written presentation:

> If, after considering any presentations made in response to the prepenalty notice, the Director determines that there was a violation by the person named in the prepenalty notice, he promptly shall issue a written notice of the imposition of the monetary penalty to that person.

31 C.F.R. § 575.704(b). OFAC, however, took no further discernible action in 1998, 1999, 2000, or 2001.

On October 26, 2002, Voices participated in a protest against recent United States military activities in Iraq. Voices members rallied in Washington, D.C. and organized a demonstration outside United Nations Headquarters in Baghdad. Ans. & Countercl. ¶ 43. Nine days later, on November 4, 2002, OFAC issued a penalty notice for the two 1998 violations. Voices was charged $10,000 per violation, to be paid within 30 days. Voices notified OFAC that it did not intend to comply with the penalty notice, and it has not paid the $20,000 fine. OFAC referred the matter to the Department of Justice for adjudication

pursuant to Section 575.705, and later filed its complaint in this Court on June 20, 2003.

## B. The Iraqi Sanctions Regime

The Regulations have been in effect since January 1991. *See* Iraqi Sanctions Regulations, 56 Fed.Reg. 2112 (January 18, 1991). The Regulations implemented several Executive Orders issued by President George H.W. Bush in the wake of Iraq's invasion of Kuwait. *Id.* They froze Iraqi assets in the United States and prohibited American business transactions with Iraq. *Id.* The Regulations cite several sources of authority, including Exec. Order No. 12724, 55 Fed.Reg. 33089 (Aug. 9, 1990)[1] ("the Order"), the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et. seq.* (1977) ("IEEPA"), and the United Nations Participation Act, 22 U.S.C. § 287c(a) (1949) ("UNPA").

Both the Order and the Regulations reference UNPA as a source of authority. *See* Pl.'s Mem. for J. at 5–6, 16–17. Congress passed UNPA in 1945 and amended it in 1949, *see* United Nations Participation Act of 1945, 81 Pub.L. No. 341, 63 Stat. 734 (1949), to give the President wide-ranging authority to comply with United Nations Security Council Resolutions. 22 U.S.C. § 287c(a). Under UNPA, the President may:

> through any agency which he may designate, and under such orders, rules, and regulations as may be prescribed by him, investigate, regulate, or prohibit, in whole or in part, economic relations ... between any foreign country or any national thereof or any person therein and the United States or any person subject to the jurisdiction thereof, or involving any property subject to the jurisdiction of the United States.

*Id.*

Additionally, the Order and Regulations purport to be authorized by IEEPA, which enables the President to identify and respond to national emergencies. *See* 50 U.S.C. § 1701(a). However, it excepts some activities from presidential authority:

> (b) ... The authority granted to the President by this section does not include the authority to regulate or prohibit, directly or indirectly ... (2) donations, by persons subject to the jurisdiction of the United States, of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering, except to the extent that the President determines that such donations (A) would seriously impair his ability to deal with any national emergency declared under section 202 of this title ... (B) are in response to coercion against the proposed recipient or donor, or (C) would endanger Armed Forces of the United States which are engaged in hostilities or are in a situation where imminent involvement in hostilities is clearly indicated by the circumstances ...

50 U.S.C. § 1702(b)(2).

## *ANALYSIS*

### A. Applicable Legal Standards

Under Fed. R. Civ. P. 12(c), a motion for judgment on the pleadings shall be granted if the moving party demonstrates that

---

1. Executive Order No. 12724 was preceded by an Executive Order entitled "Blocking Iraqi Government Property and Prohibiting Transactions with Iraq." Exec. Order No. 12722, 55 Fed.Reg. 31803 (August 2, 1990). While relevant portions differ slightly between the two orders, Section 6 of Executive Order No. 12724 indicates: "Executive Order No. 12722 of August 2, 1990, is hereby revoked to the extent inconsistent with this order." 55 Fed.Reg. at 33089.

"no material fact is in dispute and that it is entitled to judgment as a matter of law." *Peters v. Nat'l R.R. Passenger Corp.,* 966 F.2d 1483, 1485 (D.C.Cir.1992) (internal quotation omitted). The appropriate standard for reviewing a motion for judgment on the pleadings is "virtually identical" to that applied to a motion to dismiss. *Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987).

Under FED. R. CIV. P. 12(b)(1), the plaintiff bears the burden of establishing that the court has jurisdiction. *Grand Lodge of Fraternal Order of Police v. Ashcroft,* 185 F.Supp.2d 9, 13 (D.D.C.2001) (a court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority"); *see also Pitney Bowes, Inc. v. United States Postal Serv.,* 27 F.Supp.2d 15, 18 (D.D.C.1998). Although a court must accept as true all the non-movant's factual allegations when reviewing a motion to dismiss pursuant to Rule 12(b)(1), *see Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993), such allegations " 'will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim." *Grand Lodge,* 185 F.Supp.2d at 13–14 (quoting 5A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1350 (2d ed.1990)). Additionally, a court may consider material other than the allegations of the complaint in determining whether it has jurisdiction to hear the case. *See, e.g., EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624–25 n. 3 (D.C.Cir.1997); *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C.Cir.1992); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987); *Hohri v. United States,* 782 F.2d 227, 241 (D.C.Cir.1986); *Artis v. Greenspan,* 223 F.Supp.2d 149, 152 (D.D.C.2002) ("A court may consider material outside of the pleadings in ruling on a motion to dismiss for lack of venue, personal jurisdiction or subject-matter jurisdiction.")

A motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6) will not be granted unless "it appears beyond doubt that the [non-movant] can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Haynesworth v. Miller,* 820 F.2d 1245, 1254 (D.C.Cir.1987). All that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley,* 355 U.S. at 47, 78 S.Ct. 99. "Given the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984)). Under Rule 12(b)(6), the non-movant's factual allegations must be presumed true and should be liberally construed in his or her favor. *Leatherman,* 507 U.S. at 164, 113 S.Ct. 1160; *Phillips v. Bureau of Prisons,* 591 F.2d 966, 968 (D.C.Cir.1979). Conclusory legal and factual allegations, however, need not be considered by the court. *Domen v. Nat'l Rehabilitation Hosp.,* 925 F.Supp. 830, 837 (D.D.C.1996) (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)).

## B. The Legality of OFAC's Actions

### 1. Regulatory Authority

■ Voices contends that the Iraqi Sanctions Regulations are *"ultra vires and*

outside of legal authority." Ans. & Countercl. ¶ 21. Because the parties agree that Sections 2 and 5 of the Order are the primary sources of OFAC's regulatory authority at issue in this case, the Court's inquiry begins there. Section 2 prohibits, "except to the extent provided in regulations that may hereafter be issued pursuant to [the Order]":

(a) The importation into the United States of any goods or services of Iraqi origin, or any activity that promotes or is intended to promote such importation; (b) The exportation to Iraq, or to any entity operated from Iraq, or owned or controlled by the Government of Iraq, directly or indirectly, of any goods, technology (including technical data or other information) or services either (1) from the United States, or (ii) requiring the issuance of a license by a Federal agency, or any activity that promotes or is intended to promote such exportation, except donations of articles intended to relieve human suffering, such as food and supplies intended strictly for medical purposes.

55 Fed.Reg. at 33089. More generally, Section 5 provides:

The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, as may be necessary to carry out the purposes of this order. Such actions may include prohibiting or regulating payments or transfers of any property or any transactions involving the transfer of anything of economic value by any United States person to the Government of Iraq, or to any Iraqi national or entity owned or controlled, directly or indirectly, by the Government of Iraq or Iraqi nationals.

Id.

Because Section 2 explicitly contemplates further delineation, OFAC contends that the Regulations permissibly modify Section 2(b)'s exclusion of humanitarian articles by requiring that transactions in such articles be licensed. Voices, on the other hand, insists that Section 2(b) of the Order plainly precludes regulations limiting the delivery of medical supplies to Iraq. Def.'s Opp'n at 19. The Court concludes that OFAC is correct. In its connotation, Section 2 seems to limit the scope of subsequent Treasury Department regulations. However, because it allows such regulations to redefine the extent to which Section 2 prohibits the exportation to Iraq of certain goods and services, the provision effectively says very little: ultimately, Section 2 says whatever the Regulations say it does. While this structure is unorthodox—and, in its failure to provide a clear mandate for agency action, perhaps unsatisfying—it is not uncommon in the context of economic sanctions regulations. See, e.g., Exec. Order No. 12543, 51 Fed.Reg. 875 (January 7, 1986); Exec. Order No. 12635, 53 Fed.Reg. 12134 (April 8, 1988); Exec. Order No. 12725, 55 Fed.Reg. 33091 (August 9, 1990). Certainly nothing in Section 2 bars the Regulations from requiring that all transactions in humanitarian articles be licensed. Instead, the licensing requirement appears to be the kind of common-sense additional delineation contemplated by the preamble to Section 2.

█ Moreover, Section 5 of the Order gives the Secretary sweeping, catch-all authority to take any action "prohibiting or regulating payments or transfers of any property or any transactions involving the transfer of anything of economic value by any United States person to the Government of Iraq, or to any Iraqi national . . ." See 55 Fed.Reg. at 33089. Voices has not explained why its shipments of medical supplies were anything but transfers of

property within the meaning of this language. Accordingly, the Regulations' licensing requirement is unambiguously authorized by Section 5.

■ Finally, the Court finds that the Order itself rests on viable authority. UNPA gives the President extensive power to comply with United Nations directives. A review of UNPA does not disclose any limitation of that authority vis-a-vis humanitarian articles. Rather, "the President may, to the extent necessary to apply such measures, through any agency which he may designate, and under such orders, rules, and regulations as may be prescribed by him, investigate, regulate, or prohibit, in whole or in part, economic relations ..." 22 U.S.C. § 287c(a). Given the U.N.'s requirement that member states participate in the Iraqi sanctions program, *see* Res. 661, 6 Aug. 1990, *available at* http://ods-dds-ny.un.org (last visited July 20, 2004), the Executive Order and the Regulations clearly fall within the purview of UNPA.[2]

### 2. Promptness

■ Next, Voices contends that OFAC impermissibly delayed this enforcement for almost four years. According to the Regulations, "[i]f, after considering any presentations made in response to the prepenalty notice, the Director determines that there was a violation by the person named in the prepenalty notice, he *promptly shall* issue a written notice of the imposition of the monetary penalty to that person." 31 C.F.R. § 575.704(b) (emphasis added). Voices admitted its wrongdoing in its December 1998 written presentation; hence, OFAC certainly needed little time to "determine[ ] that there was a violation by the person named in the prepenalty notice." Def.'s Supp. Mem. at 8–9. Upon such a determination, the Regulations stipulated that OFAC would issue a penalty notice to Voices "promptly." *Id.* Nonetheless, OFAC waited three years and eleven months to follow Voices' admissions with a penalty notice. Ans. & Countercl. ¶ 42. The delay is rendered suspicious by the fact that the penalty notice came less than ten days after Voices's significant protest activities against the recent war in Iraq. *Id.* ¶ 43.

Rather than attempt to explain the delay, OFAC contends that the plain meaning of Section 575.704(b) does not require the Director "promptly" to determine whether there has been a violation. Pl.'s Supp. Mem. at 3. Rather, OFAC stresses that "this provision requires 'prompt' action only *after* the Director of the agency has had an opportunity to consider the written presentation *and* has determined that a penalty is warranted." *Id.* at 2–3 (emphasis original). Without identifying a fixed date, OFAC suggests that it decided to penalize Voices at some less remote point in time.[3] While the Regulations specify a 30–day time limit on issuance of the pre-penalty notice, the completion of the written presentation, and referral to the Department of the Justice, *see* 31 C.F.R

---

2. It is true, as defendants contend, that the Order cites IEEPA as additional authority, and that IEEPA limits regulation of humanitarian aid. *See* 50 U.S.C. § 1702(b)(2) ("the authority granted to the President ... does not include the authority to regulate or prohibit, directly or indirectly ... donations ... of articles, such as food, clothing, and medicine, intended to be used to relieve human suffering"). However, because UNPA clearly authorizes—and, in light of U.N. Resolution 661, may command in some form—licensing requirements of the kind at issue in this case, the Order's citation to IEEPA is surplusage.

3. OFAC's position on this score is hardly strengthened by its counsel's concession that "I don't believe there's anything in the record with respect to that time period." Tr. at 9, 17.

§§ 575.702–703, 575.705, the Regulations make no such specific provision as to the issuance of the penalty notice in Section 575.704(b). Additionally, OFAC notes that the Regulations do not set forth any consequences attendant to a failure to act promptly.

The Court is troubled by the considerable lag between the time that Voices admitted to breaking the law and issuance of the penalty notice. At a hearing on the present motions, OFAC acknowledged that "it is difficult to argue that [the alleged delay of three years and eleven months] is 'promptly.'" Tr. at 8. Nonetheless, OFAC directs the Court to numerous cases in which courts have permitted government agencies to act beyond self-imposed regulatory deadlines. *See Brock v. Pierce County,* 476 U.S. 253, 262–263, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986); *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("we have held that if a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction"); *Action on Smoking and Health v. Dept. of Labor,* 100 F.3d 991, 993 (D.C.Cir. 1996); *United States v. Montalvo–Murillo,* 495 U.S. 711, 718, 110 S.Ct. 2072, 109 L.Ed.2d 720 (1990); *Bhd. of Ry. Carmen Div. v. Pena,* 64 F.3d 702, 704 (D.C.Cir. 1995) (extending the same analysis to agency regulations). These cases, says OFAC, establish the general rule that a court should not impute to Congress a desire to terminate regulatory authority simply upon the expiration of a regulatory deadline. *See Brock,* 476 U.S. at 260, 106 S.Ct. 1834; *James Daniel Good Real Prop.,* 510 U.S. at 64, 114 S.Ct. 492.

*Brock* analyzed a provision of the Comprehensive Employment and Training Act that required the Secretary of Labor to issue a final determination as to the misuse of federal funds by grant recipients within 120 days after receiving a complaint alleging such misuse. 476 U.S. at 254, 106 S.Ct. 1834. The respondent in that case argued that a failure to act within the specified time divested the Secretary of authority to investigate the claim. The Court unanimously held that the Secretary did not lose power to recover misused funds after the expiration of the statutorily prescribed period. *Id.* at 260, 106 S.Ct. 1834 ("We would be most reluctant to conclude that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake. When, as here, there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.").[4] Rather, it found that "government agencies do not lose jurisdiction for failure to comply with statutory time limits unless the statute *both* expressly requires an agency or public official to act within a particular time period *and* specifies a consequence for failure to comply with the provision." *Id.* at 259, 106

---

4. In a footnote, the *Brock* Court indicated what "less drastic remedy" it had in mind: The Administrative Procedure Act (APA), 5 U.S.C. §§ 701–706, entitles any person 'adversely affected or aggrieved by agency action' to judicial review, § 702, unless the relevant statute precludes judicial review or 'agency action is committed to agency discretion by law,' § 701(a)(2) .... Thus, it would appear that a complainant adversely affected by the Secretary's failure to act on a complaint could bring an action in the district court. The court would have the authority to 'compel agency action unlawfully withheld or unreasonably delayed, § 706(1).'
476 U.S. at 256 n. 7.

S.Ct. 1834 (emphasis original).[5]

Here, the Regulations' requirement of "prompt" action is less specific than the 120–day window at issue in *Brock*. It cannot be said that the Regulations expressly require OFAC to act within a particular time period. Nor do the Regulations specify any consequences in the event that OFAC fails to act promptly. Voices has directed this Court to no evidence that OFAC's enforcement authority was meant to elapse if OFAC failed to issue a penalty notice after some fixed point in time. On that basis, the Court concludes that OFAC retains authority to bring an enforcement action for violations of the Regulations even where it has been less than prompt in issuing a penalty notice. *Accord Holland v. Pardee Coal Co.*, 269 F.3d 424, 432–33 (4th Cir.2001) (the Coal Act did not extinguish the authority of the Social Security Administration to assign beneficiaries after a date fixed in the statute because no consequences for tardiness were outlined in the statute); *In re Siggers*, 132 F.3d 333, 336 (6th Cir.1997) (requirement in 28 U.S.C. § 2244(b) that a second application for habeas corpus be granted or denied within 30 days of filing is advisory rather than mandatory because the statute mentions no consequences for noncompliance); *Hendrickson v. FDIC*, 113 F.3d 98, 101–02 (7th Cir.1997) (FDIC did not lose jurisdiction to prohibit a banker from professional activity despite failure

to comply with 90–day deadline for rendering administrative decision).

■ The conclusion that OFAC retains the authority to act, however, only gets OFAC half way to the judgment it seeks. As *Brock* recognized, a complainant may still have recourse to the APA where agency action has been "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). OFAC's arguments on this score do not address whether its failure to issue a penalty notice more promptly, or its decision to issue a penalty notice so immediately after Voices's protest activities, violated the APA.[6] Instead, without identifying the date on which it actually decided to penalize Voices, OFAC maintains that "there is no reason to presume that the notice was not issued 'promptly' after [OFAC] determined that the penalty was warranted." Pl.'s Supp. Mem. at 3. But there is no record before the Court to bolster this conjecture. Moreover, the circumstances here—a nearly four-year delay plus promulgation of the notice right after Voices's protest activities—do raise a fair question as to whether the notice was issued promptly after OFAC first determined whether a penalty was warranted. Accordingly, rather than grant judgment on the pleadings at this juncture, the Court concludes that the more prudent course is to permit Voices to amend its Answer and Counterclaims to state more fully an APA objection to this enforcement

**5.** The Court elaborated, "we need not, and do not hold that a statutory deadline for agency action can never bar later action unless the consequence is explicitly stated in the statute." 476 U.S. at 262 n. 9, 106 S.Ct. 1834. The ultimate inquiry was whether Congress intended to extinguish the Secretary's enforcement powers if he failed to issue a final determination within the prescribed period. Nothing in the text or legislative history of the relevant statute indicated such an intent. *Id.* at 263, 106 S.Ct. 1834.

**6.** Nor does Voices explicitly raise the APA as a defense or as the basis of a counterclaim. It comes close to doing so when it asserts that OFAC's action is "barred for its failure to comply with the regulatory procedure under which this enforcement action is brought." Ans. & Countercl. at 8. The issue was crystalized in dialogue with the Court at a hearing on the present motions. Tr. at 13, 41–45, 49–50, 72–73.

action, and to require OFAC to provide a more specific explanation (perhaps in a declaration) for the timing of the penalty notice.[7] OFAC's rationale for issuing the penalty notice when it did is a necessary aspect of this Court's review of whether the penalty notice was issued arbitrarily or capriciously.

## C. Voices's Defenses

◼Voices invokes a variety of other defenses to this enforcement action, none of which are persuasive. First, in what it calls a defense under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb (1993), Voices contends that the Regulations substantially burden their exercise of religion without a compelling justification. Ans. & Countercl. at 10. At the outset, it is far from clear that Voices acted in the service of "sincerely held religious beliefs" rather than simple charity when it undertook to violate the Regulations. *Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 834, 109 S.Ct. 1514, 103 L.Ed.2d 914 (1989) (one can invoke First Amendment protection for "sincerely held religious beliefs," not just tenets of organized religion). Assuming that Voices did engage in religious practice by going to Iraq, the Court concludes that the licensing requirement of the Regulations did not substantially burden such activities. Voices does not contend that the sanctions regime is anything other than a rule of general applicability. *See City of Boerne v. Flores*, 521 U.S. 507, 515–516, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Furthermore, the Court must defer to the judgment of the Executive that the licensing requirement served national security, a compelling justification. *See, e.g., People's Mojahedin Org. of Iran v. U.S. Dept. of State*, 182 F.3d 17, 23 (D.C.Cir.1999); *Far-*

*rakhan v. Reagan*, 669 F.Supp. 506, 508 (D.D.C.1987), *aff'd*, 851 F.2d 1500 (D.C.Cir. 1988) (rejecting First Amendment challenge by mosque to U.S. sanctions against Lyba on grounds that the government's compelling interests in national security justified infringement on the mosque's ability to make payments to Libyan entities).

◼ Next, Voices counterclaims that the entire sanctions regime violates international law. Ans. & Countercl. at 7. Voices urges this Court to enforce *jus cogens* norms and international treaties, like the Geneva Conventions, against genocide. *Id.;* Def.'s Opp'n at 44. However, federal courts have only enforced *jus cogens* norms if they are linked to a source of positive law. *See Tel–Oren v. Libyan Arab Republic*, 726 F.2d 774, 811 (D.C.Cir. 1984). The non-self-executing treaties cited by Voices are not considered positive law. *See, e.g., Al Odah v. United States*, 321 F.3d 1134, 1147 (D.C.Cir.2003) (finding the Geneva Conventions non-self-executing). Therefore, even if OFAC has effectively admitted that many deaths resulted from the economic sanctions regime, *see* Def.'s Opp'n at 34, this Court cannot find a cause of action for genocide against OFAC.

◼ Stemming from its allegation that the sanctions regime violates international law, Voices also contends that the "Nuremburg defense" permits it to violate domestic law that conflicts with international law. Ans. & Countercl. at 7. The defense derives from the Nuremburg tribunal's indictment of Nazis at the end of World War II for violations of international law, regardless of their compliance with domestic law. The Eighth Circuit has rejected the Nuremburg defense for individuals protesting American nuclear policy because

7. If documents casting light on the timing of the penalty notice already exist, they should

be provided as part of the relevant record for judicial review.

they were not "required by such law to engage in acts" that violated international law. *See United States v. Kabat*, 797 F.2d 580, 590 (8th Cir.1986). Similarly, the First Circuit concluded that "an individual cannot assert a privilege to disregard domestic law in order to escape liability under international law unless domestic law *forces* that person to violate international law." *United States v. Maxwell*, 254 F.3d 21, 30 (1st Cir.2001) (emphasis added). So, too, here Voices was not "required by law" or "forced" to deliver medical supplies to Iraq without obtaining a license. In addition, the international community has not impugned the United States sanctions regime as a violation of international law. Indeed, the United States acted in compliance with U.N. dictates in adopting the Regulations. Therefore, Voices cannot successfully advance the Nuremburg defense.

 Finally, Voices invokes a bevy of common law defenses: self-defense, necessity, excuse, justification, and duress. Ans. & Countercl. at 9–10. Both plaintiff and defendant simplify these into a defense of necessity, *see* Pl.'s Mem. for J. at 32; Def.'s Opp'n at 33, and the Court will examine them under that rubric. To advance a necessity defense, Voices must have been faced with a choice of evils and chosen the lesser evil, acted to prevent imminent harm, reasonably anticipated a direct causal relationship between its conduct and the harm to be averted, and have had no legal alternatives to violating the law. *United States v. Schoon*, 971 F.2d 193, 195 (9th Cir.1991). Regardless of the stage in the proceedings, which Voices highlights as a crucial distinction between this case and cases cited by OFAC, Def.'s

Opp'n at 33–34, Voices cannot prove that it lacked a legal alternative to violating the Regulations. It may have disapproved of the sanctions regime, but Voices had a clear, legal alternative to further its professed duty of aiding those in need: apply for a license to send medical supplies to Iraq before doing so. In fact, between August 1990 and July 31, 1997, OFAC issued 700 specific licenses for transactions with Iraq, including "the exportation to Iraq of donated medicine, medical supplies, and goods intended for humanitarian relief purposes." President's Message to Congress on Iraq, 33 WEEKLY COMP. PRES. DOC. 1164 (July 31, 1997). Without a license for its deliveries, the Court has no choice but to find Voices in violation of the Regulations, and the failure to seek a license defeats a necessity defense.

### D. Malicious and Selective Prosecution

 Voices counterclaims for money damages and injunctive relief against malicious, selective, and discriminatory[8] prosecution by the government. Def.'s Ans. & Countercl. at 18 ("The government has initiated these proceedings with malicious intent, and in retaliation for the defendant's exercise of First Amendment protected rights to oppose U.S. policy against Iraq."). To obtain monetary relief, Voices must establish subject matter jurisdiction over the Government through a waiver of sovereign immunity. *See Fed. Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). In addition, "the waiver of sovereign immunity must extend unambiguously to such monetary claims." *Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996). The waiver must be "unequivocal-

8. Because the relevant case law makes no distinction between "selective" and "discriminatory" prosecution, the Court addresses these two allegations as the single claim of selective prosecution. *See United States v. Bass*, 536 U.S. 862, 863, 122 S.Ct. 2389, 153 L.Ed.2d 769 (2002); *United States v. Diggs*, 613 F.2d 988, 1003 (D.C.Cir.1979).

ly expressed" in a statute and will be interpreted in favor of the Government. *Id.*

Voices does not explain how this Court has subject matter jurisdiction to hear its claim for money damages. The Federal Tort Claims Act ("FTCA") requires a claimant to exhaust administrative remedies before it may be invoked. *See* 28 U.S.C. § 2675(a) (1948) ("The claimant shall have first presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing and sent by certified or registered mail."). Courts have consistently held that this requirement is jurisdictional. *See McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993); *Simpkins v. District of Columbia Gov't*, 108 F.3d 366, 371 (D.C.Cir.1997); *Jackson v. United States*, 730 F.2d 808, 809 (D.C.Cir.1984); *Arbitraje Casa de Cambio, S.A. de C.V. v. United States Postal Serv.*, 297 F.Supp.2d 165, 170 (D.D.C.2003). Voices never filed claims for malicious or selective prosecution with OFAC before raising them in court. Accordingly, the FTCA does not waive the government's sovereign immunity as to the claim for money damages. Voices has proposed no alternative sources of waiver, and therefore, the Court can only grant injunctive relief if it finds merit in Voices' claims of malicious or selective prosecution at this juncture.

A malicious prosecution claim can be raised only after the termination of court proceedings in favor of the defendant. *Moore v. United States*, 213 F.3d 705, 710 (D.C.Cir.2000); *Shulman v. Miskell*, 626 F.2d 173, 174 (D.C.Cir.1980). Since this case has not been completed, Voices's malicious prosecution claim is untimely. Voices has conceded as much. *See* Def.'s Opp'n at 28 ("malicious prosecution claims are often filed only after the underlying governmental action is finished"); Tr. at 46–47, ll. 24–25, 1. Thus, the claim for malicious prosecution is properly dismissed without prejudice.

■ Voices' selective prosecution claim fails for a different reason. To advance a selective prosecution claim, "a plaintiff must offer 'at least a colorable claim' that (1) he or she was singled out for prosecution from among others similarly situated, and (2) that his or her prosecution was improperly motivated." *Branch Ministries, Inc. v. Richardson*, 970 F.Supp. 11, 16 (D.D.C.1997) (quoting *Attorney Gen. of the U.S. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C.Cir.1982)). "[A] colorable showing must be made with respect to both prongs of the test." *Id.* Voices has made no allegation as to the first prong of the selective prosecution analysis: it does not allege that it was selected from among other violators for prosecution. The Court understands Voices' professed unwillingness to incriminate other like-minded organizations. Tr. at 47, ll. 12–14. However, without at least a colorable claim that it was selected for prosecution from among other similarly situated violators, the selective prosecution claim cannot proceed. Additionally, Voices offers the timing of events as evidence of the second prong of selective prosecution, improper motive. Def.'s Countercl. ¶¶ 41–43. Voices staged visible anti-war protests in October 2002, and OFAC delivered a long-delayed penalty notice less than ten days later. *Id.* Courts have held, however, that "sequence of events is not alone sufficient to raise an appearance of vindictive prosecution" in the context of pre-trial motions. *United States v. Gallegos–Curiel*, 681 F.2d 1164, 1169 (9th Cir.1982); *see United States v. Sequoia Orange Co.*, 1994 WL 903688 (E.D.Cal.1994). Hence, while the timing of the issuance of the notice is suspicious,

the record is not sufficient to support a selective prosecution claim at this time.

### CONCLUSION

OFAC's motion to dismiss Voices's counterclaims shall be granted. OFAC's motion for judgment on the pleadings, however, shall be denied without prejudice at this time. Voices shall be afforded an opportunity to amend its Answer and Counterclaims to challenge this enforcement action more specifically on APA grounds, and OFAC shall then provide an explanation, assuming one exists, regarding the timing of the penalty notice. A separate order is issued herewith.

### ORDER

Upon consideration of plaintiff's motion for judgment on the pleadings and to dismiss defendant's counter-claims, and for the reasons stated in the Memorandum Opinion issued on this 9th day of August, 2004, it is hereby

ORDERED that plaintiff's motion to dismiss defendant's counterclaims is GRANTED; and it is further

ORDERED that plaintiff's motion for judgment on the pleadings is DENIED without prejudice; and it is further

ORDERED that defendant shall have leave to amend its Answer and Counterclaims by not later than September 1, 2004, in the manner discussed in the Memorandum Opinion issued on this date; and it is further

ORDERED that, by not later than September 20, 2004, plaintiff shall provide a more specific explanation for the timing of the penalty notice, including any documents casting light on the timing of the penalty notice that currently exist.